TURNER ET AL. *v.* FOUCHE ET AL.

No. 23.   Argued October 20, 1969—Decided January 19, 1970

*Michael Meltsner* argued the cause for appellants. With him on the briefs were *Jack Greenberg* and *Howard Moore, Jr.*

*Alfred L. Evans, Jr.*, Assistant Attorney General of Georgia, argued the cause for appellees. With him on the brief for the State of Georgia were *Arthur K. Bolton,* Attorney General, *Howard N. Hill, Jr.*, Executive Assistant Attorney General, and *J. Lee Perry*, Assistant Attorney General.

*Charles J. Bloch* and *Wilbur D. Owens, Jr.*, filed a brief for appellees Fouche et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

This case, a companion to *Carter* v. *Jury Commission of Greene County, ante,* p. 320, involves a challenge to the constitutionality of the system used in many counties of Georgia to select juries and school boards. The basic statutory scheme at issue is this. The county board of education consists of five freeholders.[1] It is selected by the grand jury,[2] which in turn is drawn from a jury list selected by the six-member county jury commission.[3] The commissioners are appointed by the judge of the state superior court for the circuit in which the county is located.[4]

---

[1] Ga. Const., Art. VIII, § V, ¶ I, Ga. Code Ann. § 2-6801 (1948). At the oral argument we were advised that under Georgia law a "freeholder" is any person who owns real estate.

[2] *Ibid.* See also Ga. Code Ann. § 32-902 (1969).

[3] Ga. Code Ann. §§ 59-101, 59-106 (1965 and Supp. 1968).

[4] Ga. Code Ann. § 59-101 (1965). Prior to 1966 the superior court judges were elected by all the voters in the State, but now they are elected by the voters of the circuits over which they have jurisdiction. See Ga. Const., Art. VI, § III, ¶ II, Ga. Code Ann. § 2-3802 (Supp. 1968); *Stokes* v. *Fortson,* 234 F. Supp. 575.

Some 2,500 to 3,000 people live in Taliaferro County, Georgia, of whom about 60% are Negroes.[5] The county school system consists of a grammar school and a high school, and all the students at both schools are Negroes, every white pupil having transferred elsewhere.[6] Sandra and Calvin Turner, a Negro schoolchild and her father who reside in that county, brought this class action against the members of the county board of education, the jury commissioners, and three named white grand jurors.[7] Their complaint alleged that the board of education consisted entirely of white people; that it had

---

[5] In its brief Georgia informs us that its Department of Public Health estimates that Taliaferro County now has about 1,500 Negro and 1,000 white citizens. According to the 1960 federal census, the county had a population of 3,370, of whom 2,096 were Negroes and 1,273 white people. U. S. Dept. of Commerce, Bureau of the Census, 1960 Census of Population, Vol. I, Characteristics of the Population, pt. 12, Georgia, 12–83.

[6] This state of affairs has arisen following litigation attacking the county's former dual school system. Prior to the fall of 1965 Taliaferro County had used one school building for Negroes and the other for whites. In that year, after 87 Negro pupils sought transfers to a desegregated school, the superintendent, knowing the white school would be closed, arranged for the transfer of the white pupils, at public expense, to public schools in adjoining counties. A three-judge District Court declared the arrangement illegal, placed the Taliaferro County school system in receivership under the State's superintendent of schools, and instructed him to prepare a plan that would allow those Negroes who wanted to transfer to a desegregated school the opportunity to do so. *Turner* v. *Goolsby,* 255 F. Supp. 724. It is undisputed that some white pupils now attend a private institution in the county. In addition, the appellants suggest that white children continue to attend public schools in neighboring counties. Efforts to combine districts to avoid an all-Negro school system in Taliaferro County have proved unsuccessful.

[7] The District Court struck the grand jurors as parties defendant for failure of the appellants to state as against them a claim upon which relief could be granted. The appellants did not appeal from that portion of the judgment below, and the motion of the appellee grand jurors to dismiss the appeal as to them is granted.

been selected by a predominantly white grand jury, which in turn had been selected by the jury commissioners, all of whom were white people. The complaint charged that the board of education had deprived the Negro schoolchildren of textbooks, facilities, and other advantages; also that the Turners and other Negro citizens had sought unsuccessfully to communicate their dissatisfaction to the board of education.

According to the appellants, the members of the county grand jury, on which white people were perennially overrepresented and Negroes underrepresented, chose only white people as members of the board of education pursuant to the Georgia constitutional and statutory provisions governing the school-board selection. The complaint attacked those provisions as accounting for both the exclusion of Negroes and nonfreeholders from the board of education, and for the merely token inclusion of Negroes on the grand juries. The appellants sought (1) an injunction prohibiting enforcement of the Georgia constitutional and statutory provisions by which the board of education and grand jury were selected; (2) a declaration that the provisions were void on their face and as applied; (3) a further declaration that the various positions on the board of education, grand jury, and jury commission were vacant; (4) the appointment of a receiver for the school system and a special master for the selection of the grand jurors; and (5) $500,000 in ancillary damages.

A three-judge District Court was convened pursuant to 28 U. S. C. §§ 2281 and 2284, and conducted extensive evidentiary hearings. The evidence showed that whenever a jury commissioner thought a voter from his area of the county qualified as a potentially good juror, he offered the name for consideration to his fellow commissioners; if all agreed, the name went on the master

jury list. No name of a county resident was placed on the list unless he was personally known to at least one of the jury commissioners. The commissioners looked for "people that we felt would be capable of interpreting proceedings of court and . . . render[ing] a just verdict . . . ." The state superior court judge had instructed them to put Negroes on the list. Following the compilation of the list, the commissioners "picked the ones we thought were the very best people in the county" and put them on the grand-jury list. The superior court judge then drew the names of the grand jurors at random in open court. Only he could excuse from grand-jury service those whose names he drew; and he denied that Negroes were ever excused out of turn, or on account of their race.

At its first hearing, held in January 1968, the District Court voiced its concern that only 11 Negroes had found their way to the 130-member grand-jury list. The court adjourned for one month to enable the defendants to remedy the situation. It noted that two vacancies had opened up on the board of education and that, although the board had held an interim election, the grand jury had not yet confirmed the new members. The court suggested that "[i]f those two men would willingly stand aside the other members might select two outstanding Negro citizens . . . to go on the Board." The court also advised counsel for the defendants to explain the law of jury discrimination to his clients, and expressed the hope that the jury commissioners would be "generous" in their recomposition of the panel.

At the adjourned hearing in February, it appeared that three days after the first hearing the state superior court judge had discharged the county grand jury and directed the jury commissioners to recompose the jury list. Work-

ing from the voter registration list at the last general election,[8] the commissioners had prepared a new grand-jury list containing the names of 44 Negroes and 77 white people. From this list the superior court judge drew the names that led to the impaneling of a new grand jury of 23 members, of whom only six were Negroes. Meanwhile the board of education had elected a Negro and a white man to fill the two vacancies, and the new grand jury had confirmed the new members in their offices.

Following these developments, the District Court declined to invalidate on their face either the various provisions governing the school-board and grand-jury selections, or the freeholder requirement for school-board membership. It found that at the commencement of suit Negroes had been systematically excluded from the grand juries through token inclusion, but it concluded that the new grand-jury list, drawn following the January hearing, was not unconstitutional. 290 F. Supp. 648.[9]

Subsequently the District Court entered a final judgment permanently enjoining the defendant jury commissioners and their successors from systematically excluding Negroes from the Taliaferro County grand-jury system. The appellants, complaining of the court's failure to hold the challenged provisions of Georgia law invalid on their face and as applied, took a direct appeal

---

[8] Georgia has used the voter registration lists rather than the books of the tax receiver since our decision in *Whitus* v. *Georgia*, 385 U. S. 545.

[9] The District Court found that the appellants' claim that the board of education had deprived the Negro schoolchildren of textbooks, facilities, and other advantages failed for want of proof. The court also declined to reach the appellants' claim for ancillary damages, leaving this question to single-judge inquiry. No issue concerning these rulings is presented on the appeal.

to this Court pursuant to 28 U. S. C. § 1253, and we noted probable jurisdiction, 393 U. S. 1078.[10]

## I

The appellants urge that the constitutional and statutory scheme by which the Taliaferro County grand jury selects the board of education is unconstitutional on its face. They point to the discretion of the state superior

---

[10] We reject the appellees' suggestion that we lack jurisdiction to entertain an appeal from the District Court on the theory that a court of three judges was not required under 28 U. S. C. § 2281 because the appellants sought to enjoin only the acts of county officials. The jury commissioners and members of the board of education were "functioning pursuant to a statewide policy and performing a state function," *Moody* v. *Flowers,* 387 U. S. 97, 102; cf. *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89, 92–95; and see *Dusch* v. *Davis,* 387 U. S. 112, 114; *Sailors* v. *Board of Education,* 387 U. S. 105, 107. The appellants cannot be denied a three-judge court below and direct review here simply because Georgia chooses to denominate as "local" or "county" the officials to whom it has entrusted the administration of the challenged constitutional and statutory provisions. *Rorick* v. *Board of Commissioners,* 307 U. S. 208, 212; cf. *City of Cleveland* v. *United States,* 323 U. S. 329, 332.

Under Georgia law Taliaferro County may replace the constitutional and statutory arrangement by which the grand jury elects the board of education with the direct election of the board by the qualified voters of the county upon the enactment of a local or special law by the legislature and its approval in a referendum by a majority of the qualified voters. Ga. Const., Art. VIII, § V, ¶ 2, Ga. Code Ann. § 2–6802 (Supp. 1968). But Georgia does not suggest that so many counties have taken advantage of this provision that the present selection of the board by the grand jury in effect amounts to a local option.

The appellees also propose a distinction between attacks on statutes and attacks upon the results of their administration, and urge that the appellants' case comes within the latter category. But this argument overlooks the line, delineated by our past decisions, that falls between a petition for injunction on the ground of the unconstitutionality of a *statute,* either on its face or as applied,

court judge to exclude anyone he deems not "discreet" from appointment to the jury commission,[11] and of the jury commissioners to eliminate from grand-jury service anyone they find not "upright" and "intelligent." [12] These provisions, the appellants say, provide the county officials an opportunity to discriminate exercised both before and after the commencement of this litigation. It is argued that the terms are so vague as to leave the judge and jury commissioners at large in the exercise of discretion, with their decisions "unguided by

which requires a three-judge court, and a petition seeking an injunction on the ground of the unconstitutionality of the *result* obtained by the use of a statute not attacked as unconstitutional. *Louisiana* v. *United States,* 380 U. S. 145, 150 and n. 9; *Query* v. *United States,* 316 U. S. 486, 489; *Ex parte Bransford,* 310 U. S. 354, 361; *Stratton* v. *St. Louis S. W. R. Co.,* 282 U. S. 10, 15; *Ex parte Hobbs,* 280 U. S. 168, 172.

Similarly, we reject the appellees' contention, ancillary to their basic attack on our jurisdiction, that the three-judge court was improperly convened because of the insubstantiality of the appellants' challenge to the Georgia laws. *Swift & Co.* v. *Wickham,* 382 U. S. 111, 115; *Idlewild Bon Voyage Liquor Corp.* v. *Epstein,* 370 U. S. 713, 715 *(per curiam)*; *California Water Service Co.* v. *City of Redding,* 304 U. S. 252, 255 *(per curiam)*; *Ex parte Poresky,* 290 U. S. 30, 32 *(per curiam)*. Further, the District Court properly entertained the question whether the constitutional and statutory complex, even if not invalid on its face, was unconstitutionally administered. Without regard to whether that issue was one by itself warranting a three-judge court, see *Ex parte Bransford, supra;* Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1, 37–50, it related to the appellants' claim that Georgia's school-board selection procedure was unlawful on its face. *Flast* v. *Cohen,* 392 U. S. 83, 90–91; *Zemel* v. *Rusk,* 381 U. S. 1, 5–6; *United States* v. *Georgia Pub. Serv. Commission,* 371 U. S. 285, 287–288; *Paul* v. *United States,* 371 U. S. 245, 249–250; *Florida Lime & Avocado Growers, Inc.* v. *Jacobsen,* 362 U. S. 73, 75–85; *Louisville & N. R. Co.* v. *Garrett,* 231 U. S. 298, 303–304.

[11] Ga. Code Ann. § 59–101 (1965).

[12] Ga. Code Ann. § 59–106 (Supp. 1968).

statutory or other guidelines." Only by excising the challenged terms from Georgia's laws, it is urged, can the jury discrimination revealed in the record of this case be eliminated.

Such arguments are similar to those advanced in *Carter* v. *Jury Commission of Greene County, ante,* p. 320. Our decision in that case fairly controls disposition of the contentions here. Georgia's constitutional and statutory scheme for selecting its grand juries and boards of education is not inherently unfair, or necessarily incapable of administration without regard to race; the federal courts are not powerless to remedy unconstitutional departures from Georgia law by declaratory and injunctive relief. The challenged provisions do not refer to race; indeed, they impose on the jury commissioners the affirmative duty to supplement the jury lists by going out into the county and personally acquainting themselves with other citizens of the county whenever the jury lists in existence do not fairly represent a cross section of the county's upright and intelligent citizens.[13]

---

[13] *Ibid.*

Our decisions in *Avery* v. *Georgia,* 345 U. S. 559, and *Whitus* v. *Georgia,* 385 U. S. 545, cannot aid the appellants. In *Avery* we reversed a judgment of conviction where the names of prospective petit jurors had been printed on differently colored tickets according to their race—white tickets for white people, and yellow tickets for Negroes. A state superior court judge drew the names from the jury box and handed them to the sheriff, who entrusted them to the court clerk for arranging the tickets and typing up the list of persons to be called to serve on the panel. We found that the use of the white and yellow tickets made it easier "for those to discriminate who are of a mind to discriminate," and that even if the judge had drawn the names without looking to see the color of the tickets, "opportunity was available to resort to [discrimination] at other stages in the selection process." 345 U. S., at 562.

*Whitus* involved a refinement of the process we had condemned in *Avery.* In *Whitus* the jury commissioners made up the jury list from which both traverse and grand jurors were selected by reference

But the appellants contend that even if the challenged provisions are not void on their face, they have been unconstitutionally applied. The District Court found that prior to the commencement of suit Negroes had been excluded in the administration of the grand-jury system, and the appellees do not contest that finding here.[14] The District Court also concluded that the newly composed grand-jury list was constitutional, and the appellants challenge that ruling. Consideration of the issues thus presented requires a fuller statement of the events following the January hearing in the court below.

---

to the tax digest, which was segregated into sections—one with white sheets for white people and the other with yellow sheets for Negroes—and to an old jury list required by former law to be made up from the tax digest. We concluded that "[u]nder such a system the opportunity for discrimination was present," and on the record before us we could not say that that opportunity "was not resorted to by the commissioners." 385 U. S., at 552.

In both *Avery* and *Whitus* we noted without comment the "upright and intelligent" requirement for jury membership. 385 U. S., at 552; 345 U. S., at 562. In *Avery* we expressly commented that Georgia law did not authorize the use of the potentially discriminatory process under review. 345 U. S., at 562. In both cases we struck down the white-and-yellow system, however varied in design, because of the obvious danger of abuse. See *Williams* v. *Georgia*, 349 U. S. 375, 382. We dealt in both cases with a physical, even mechanical, aspect of the jury-selection process that could have no conceivable purpose or effect other than to enable those so disposed to discriminate against Negroes solely on the basis of their race. It is evident that the challenged provisions now before us contain no such defect. The appellants cannot contend that the present requirements serve no rational function other than to afford an opportunity to state officials to discriminate against Negroes if they desire to do so.

[14] Indeed, at the oral argument before this Court, counsel candidly conceded: "There is no question but that Georgia's jury selection statute is capable of being improperly administered. There is no question but that in Taliaferro County, Georgia, it has been misadministered."

As noted above, after the District Court had held its first hearing, the state superior court judge discharged the grand jury then sitting and ordered the jury commissioners to draw up a new jury list. The commissioners obtained the list of all persons registered to vote in the county in the last general election—2,152 names. To assist in the identification of all the people on the list, the commissioners consulted with "three Negroes that [they] brought in to work with [them] one afternoon . . . ." From the list the commissioners eliminated 374 people for poor health and old age; 79 as under 21 years old; [15] 93 as dead; 514 as away from the county most of the time but maintaining a permanent place of residence there; 48 who requested that they be removed from consideration; 225 about whom the commissioners could obtain no information; 33 as duplicated names; and 178 "as not conforming to the statutory qualifications for juries either because of their being unintelligent or because of their not being upright citizens."

The process of elimination left 608 names. The commissioners arranged the names in alphabetical order and placed every other one on the list of potential jurors. At this point, for the first time, the commissioners classified the remaining 304 people by race: 113 were Negro, 191 white people. From this list the commissioners drew two-fifths of the names by lot for the grand-jury list; a check revealed 44 Negroes and 77 white people. The state superior court judge drew from this group nine Negroes and 23 white people by lot. He excused nine, leaving a 23-member grand jury of whom only six were

---

[15] Although Georgia grants the franchise to its citizens at 18, Ga. Const., Art. II, § I, ¶II, Ga. Code Ann. § 2–702 (1948), jurors must be over 21, Ga. Code Ann. § 59–201 (1965), and so the jury commissioners struck all persons under 21.

Negroes.[16]  It was this grand jury that the District Court determined had been constitutionally impaneled.

After the February hearing of the District Court, and at that court's request, the commissioners classified by race the persons eliminated from the voter list in arriving at the 608 persons eligible for jury service. The classification revealed that 171 of those rejected as unintelligent or not upright were Negroes—96% of the total removed for that reason.[17]  Although at the adjourned hearing the District Court recognized the potential for discrimination underlying the exclusion process, it did not reopen the matter following its receipt of the racial classification to consider the extraordinarily high percentage of Negroes eliminated as "unintelligent" or not "upright," or the large number of persons about whom the commissioners said they could obtain no information even though they were registered to vote in the county.

The appellants insist the District Court has erred. They say that since the grand jury selects the board of education, the situation must be viewed as one involving a distribution of voting power among the citizens of Taliaferro County in the manner of a voting apportionment case.  A grand jury with only about 25% Negro membership, they say, constitutes the school-board "electorate" in a county whose population is about 60% Negro.  The State must offer a compelling justification,

---

[16] At the adjourned hearing the superior court judge testified that he regularly excuses people from the traverse-jury lists as well as the grand-jury panel he draws in the courtroom. Whether the request to be excused was made in open court, in writing, or over the telephone, only the judge could excuse from grand-jury service those whose names he had drawn.

[17] It also appeared that 191 of those stricken for poor health and old age were Negro (51%); 71 of those under 21 (90%); 263 of those away from the county (51%); and three who asked to be relieved from jury duty (6%).

it is argued, in support of its "fencing out" such a substantial proportion of the potential Negro "electors" in the county.

We do not find it necessary to consider the appellants' argument. Nor do we reach the premise upon which it rests—that the choice of the county board of education by the grand jury rather than delegates from local school boards turns the challenged procedure into an "election" for federal constitutional purposes.[18] For we think that even under long-established tests for racial discrimination in the composition of juries, the District Court erred in its determination that the new list before it had been properly compiled.

The undisputed fact was that Negroes composed only 37% of the Taliaferro County citizens on the 304-member list from which the new grand jury was drawn. That figure contrasts sharply with the representation that their percentage (60%) of the general Taliaferro County population would have led them to obtain in a random selection. In the absence of a countervailing explanation by the appellees, we cannot say that the underrepresentation reflected in these figures is so insubstantial as to warrant no corrective action by a federal court charged with the responsibility of enforcing constitutional guarantees.

Specifically, we hold that the District Court should have responded to the elimination of 171 Negroes out of the 178 citizens disqualified for lack of "intelligence" or "uprightness." On the record as presently constituted, it is impossible to say that this purge of Negroes from the roster of potential jurors did not contribute in substantial measure to the ultimate underrepresentation. The retention of these 178 citizens might well have produced a jury list of at least an equal percentage of

---

[18] See *Sailors* v. *Board of Education*, 387 U. S. 105, 106.

Negroes and white people, instead of the highly dispro-portionate list that actually materialized.

A second factor should have called itself to the District Court's attention: the lack of information respecting the 225 citizens named on the county's voting list but un-known to the jury commissioners or their assistants. Entirely apart from the question whether the commis-sioners' failure to inquire into the eligibility of the 225 voters comported with their statutory duty to ensure that the jury list fairly represents a cross-section of the county's intelligent and upright citizens,[19] the court should not have passed without response the commis-sioners' elimination from consideration for jury service of about 9% of the population of the entire county. In the face of the commissioners' unfamiliarity with Negroes in the community and the informality of the arrange-ment by which they sought to remedy the deficiency in their knowledge upon recompiling the jury list, we cannot assume that inquiry would not have led to the discovery of many qualified Negroes.

In sum, the appellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole and of Negroes on the newly constituted jury list. They further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria. The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it.[20]

---

[19] Ga. Code Ann. § 59–106 (Supp. 1968).

[20] See *Jones* v. *Georgia*, 389 U. S. 24, 25 (*per curiam*); *Coleman* v. *Alabama*, 389 U. S. 22, 23 (*per curiam*); *Avery* v. *Georgia*, 345 U. S. 559, 562–563; *Patton* v. *Mississippi*, 332 U. S. 463, 468–469; *Hill* v. *Texas*, 316 U. S. 400, 405–406; *Norris* v. *Alabama*, 294 U. S. 587, 594–596, 598.

The testimony of the jury commissioners and the superior court judge that they included or excluded no one because of race did not suffice to overcome the appellants' prima facie case.[21] So far the appellees have offered no explanation for the overwhelming percentage of Negroes disqualified as not "upright" or "intelligent," or for the failure to determine the eligibility of a substantial segment of the county's already registered voters. No explanation for this state of affairs appears in the record. The evidentiary void deprives the District Court's holding of support in the record as presently constituted. "If there is a 'vacuum' it is one which the State must fill, by moving in with sufficient evidence to dispel the prima facie case of discrimination."[22]

## II

The appellants also urge that the limitation of school-board membership to freeholders violates the Equal Protection Clause of the Fourteenth Amendment.[23] The

---

[21] *Sims* v. *Georgia,* 389 U. S. 404, 407; *Whitus* v. *Georgia,* 385 U. S. 545, 551; *Eubanks* v. *Louisiana,* 356 U. S. 584, 587; *Hernandez* v. *Texas,* 347 U. S. 475, 481–482; *Avery* v. *Georgia, supra,* at 561; *Norris* v. *Alabama, supra,* at 598; cf. *Brown* v. *Allen,* 344 U. S. 443, 481.

[22] *Avery* v. *Georgia, supra,* at 562; cf. *Pierre* v. *Louisiana,* 306 U. S. 354, 361–362; *Norris* v. *Alabama, supra,* at 594–595, 598–599.

We reserve the question whether a State that for years has provided separate and inferior schools for Negroes may now disqualify them from jury service on the "impartial" ground of educational inadequacy, however defined. See *Gaston County* v. *United States,* 395 U. S. 285, 297.

[23] Georgia's contention that no appellant has standing to raise this claim is without merit. The appellant Calvin Turner is a freeholder, but the appellant Joseph Heath is not. Heath's motion to intervene was granted by the District Court for the express purpose of adding a party plaintiff to the case to ensure that the court could reach the merits of this issue. Georgia also argues that the question is not properly before us because the record is devoid

District Court rejected this claim, finding no evidence before it "to indicate that such a qualification resulted in an invidious discrimination against any particular segment of the community, based on race or otherwise." 290 F. Supp., at 652.

Subsequent to the ruling of the District Court, this Court decided *Kramer* v. *Union Free School District,* 395 U. S. 621, and *Cipriano* v. *City of Houma,* 395 U. S. 701. The appellants urge that those decisions require Georgia to demonstrate a "compelling" interest in support of its freeholder requirement for school-board membership. The appellees reply that *Kramer* and *Cipriano* are inapposite because they involved exclusions from voting, not from office-holding. We find it unnecessary to resolve the dispute, because the Georgia freeholder requirement must fall even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective.[24]

We may assume that the appellants have no right to be appointed to the Taliaferro County board of education.[25] But the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications.[26] The State may not deny to some the privilege of holding public office that

---

of evidence that the freeholder requirement actually has operated to exclude anyone from the Taliaferro County board of education. But the appellant Heath's allegation that he is not a freeholder is uncontested, and Georgia can hardly urge that her county officials may be depended on to ignore a provision of state law.

[24] *McGowan* v. *Maryland,* 366 U. S. 420, 425–426; *Kotch* v. *Board of River Port Pilot Commissioners,* 330 U. S. 552, 556.

[25] Cf. *Snowden* v. *Hughes,* 321 U. S. 1, 7.

[26] Cf. *Anderson* v. *Martin,* 375 U. S. 399, 402, 404; *Snowden* v. *Hughes, supra,* at 7–8.

it extends to others on the basis of distinctions that violate federal constitutional guarantees.[27]

Georgia concedes that "the desirability and wisdom of 'freeholder' requirements for State or county political office may indeed be open to question . . . ." But apart from its contention that prior decisions of this Court foreclose any challenge to the constitutionality of such "freeholder" requirements—a contention we think ill-founded[28]—the sole argument Georgia advances in support of its statute is that nothing in its constitution or laws specifies any minimum quantity or value for the real property the freeholder must own. Thus, says Georgia, anyone who seriously aspires to county school-board membership "would be able to obtain a conveyance of the single square inch of land he would require to become a 'freeholder.'"

If we take Georgia at its word, it is difficult to conceive of any rational state interest underlying its requirement. But even absent Georgia's own indication of the insubstantiality of its interest in preserving the freeholder requirement, it seems impossible to discern any interest the qualification can serve. It cannot be seriously urged that a citizen in all other respects qualified to sit on a school board must also own real property if he is to

---

[27] Cf. *Carrington* v. *Rash*, 380 U. S. 89, 91; *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45, 50–51; *Pope* v. *Williams*, 193 U. S. 621, 632.

[28] Language to such effect may be found in *Strauder* v. *West Virginia*, 100 U. S. 303, 310. But the passage relied upon by Georgia is no more than dictum. Later decisions invoking *Strauder* fall in the same category. *Gibson* v. *Mississippi*, 162 U. S. 565, 580; *Neal* v. *Delaware*, 103 U. S. 370, 386. *Vought* v. *Wisconsin*, 217 U. S. 590, is hardly apposite; there we dismissed an appeal for want of a meritorious question in a case where the appellant challenged a judgment of conviction arising from an indictment returned by a grand jury selected by commissioners required by statute to be freeholders.

participate responsibly in educational decisions, without regard to whether he is a parent with children in the local schools, a lessee who effectively pays the property taxes of his lessor as part of his rent, or a state and federal taxpayer contributing to the approximately 85% of the Taliaferro County annual school budget derived from sources other than the board of education's own levy on real property.

Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold.[29] Whatever objectives Georgia seeks to obtain by its "freeholder" requirement must be secured, in this instance at least, by means more finely tailored to achieve the desired goal.[30] Without excluding the possibility that other circumstances might present themselves in which a property qualification for office-holding could survive constitutional scrutiny, we cannot say, on the record before us, that the present freeholder requirement for membership on the county board of education amounts to anything more than invidious discrimination.

The judgment below is vacated, and the cause is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

---

[29] Cf. *Leary* v. *United States,* 395 U. S. 6, 32–36; *Tot* v. *United States,* 319 U. S. 463, 468.

[30] Cf. *Carrington* v. *Rash, supra,* at 95–96.