**William E. BING et al., Plaintiffs-Appellants,**

v.

**ROADWAY EXPRESS, INC., Defendant-Appellee.**

**No. 30414.**

United States Court of Appeals, Fifth Circuit.

June 29, 1971.

W. M. Mathews, Jr., Atlanta, Ga., for plaintiffs-appellants.

Charles Kelso, Fisher & Phillips, Atlanta, Ga., for defendant-appellee.

Before THORNBERRY and GODBOLD, Circuit Judges, and BOOTLE, District Judge.

THORNBERRY, Circuit Judge:

William E. Bing, on behalf of himself and other Negroes similarly situated, instituted this action against Roadway Express, Incorporated, alleging that Roadway violated Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., by maintaining a "no-transfer" rule that restricts and penalizes job transfers between the jobs of "city driver" and "road driver." After a non-jury trial the district court entered a judgment in favor of Roadway and dismissed the action. Bing appeals; we reverse and remand.

Roadway Express, Incorporated, a motor freight company serving the eastern United States, is a member of a nation-wide multi-employer bargaining unit that operates under national, area, and local union agreements with the International Brotherhood of Teamsters. Pursuant to these agreements, Roadway maintains separate collective bargaining contracts with, inter alia, (1) its long distance road drivers (road drivers), and (2) its dockmen, freight checkers, and local city drivers (city drivers). Employees accrue seniority and other job rights pursuant to the particular contract under which they are working. Since 1958 Roadway, because of alleged problems created by transfers, has intentionally discouraged transfers between the collective bargaining units—particularly between the road driver unit and the city driver unit—through the application of a "no-transfer" rule. The rule, in effect, requires an employee who desires to transfer to another job to resign his present position and thereby forfeit the employment rights accrued under it. He must then apply for the new position as if he were a stranger to the Company,

with no assurance from Roadway prior to resigning his job that he will be hired for the new position.

Appellant Bing, who entered Roadway's employ as a casual worker at its Atlanta, Georgia terminal in October of 1962, became a full-time city driver in April, 1964. In October of 1964 Bing requested to be transferred to a road driver position, a job considered superior to that of city driver, and was told that the Company was not currently hiring road drivers. In April of 1965 the Company denied Bing's second request for transfer to the road driver unit on the basis of the no-transfer rule.[1] Bing complained to the EEOC, which found reasonable cause to believe that the Company was engaging in unlawful employment practices. When voluntary compliance was not achieved, Bing brought the instant action.

Evidence adduced during the trial court proceedings indicated that although Roadway had hired 203 road drivers from the time it commenced business in its Atlanta terminal until January 1, 1965, and had employed approximately 90 road drivers between February and December of 1965, it had not hired a single Negro road driver. Instead, all Negroes hired as drivers were placed in city driver positions. All road drivers are, and always have been, white; all Negro drivers are city drivers, though not all city drivers are Negro. Bing contends that the aforementioned figures demonstrate that Roadway has engaged in discriminatory hiring practices by placing only white employees in road driver positions. He then asserts that the no-transfer rule serves to perpetuate discrimination by locking Negroes into the less desirable jobs for which they were initially hired. Rejecting Bing's argument, the district court determined, inter alia, that "[t]he fact that the road unit of the defendant at its Atlanta terminal is composed entirely of white employees does not show racial discrimination, without any evi-

---

1. Bing refused to resign his position of city driver and forfeit his accrued employment benefits before applying for the position of road driver.

dence of discriminatory hiring practices for that particular category * * *," and that "[t]he defendant's policy of restricting transfers between city drivers and road drivers is a valid departmental operation which is not based on race, but established and maintained as a result of other bona fide business needs and justifications. * * *" The district court concluded that " * * * the plaintiff individually, and as a representative of the class * * *, has failed to carry the burden of establishing that the defendant maintains a policy of discrimination in the employment practices with respect to the plaintiff and to the said class * * *."

In support of its conclusions the district court relied very heavily upon Jones v. Lee Way Motor Freight, Incorporated, 300 F.Supp. 653 (W.D.Okl.1969), a case involving a fact situation almost identical to the instant controversy. Subsequent to the district court's decision in the case at bar, the *Lee Way* decision was reversed by the Tenth Circuit, Jones v. Lee Way Motor Freight, Incorporated, 10th Cir. 1970, 431 F.2d 245, cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). Finding ourselves in agreement with the Tenth Circuit's decision, we reverse the judgment of the court below. We direct our attention, first, to Roadway's past hiring practices, and, secondly, to the Company's no-transfer policy.

## ROADWAY'S HIRING PRACTICES

■ As noted above the district court determined that Roadway had not engaged in discriminatory hiring practices in staffing its driver positions. We believe the district court's conclusion was founded upon a misapprehension of the value of Bing's statistical evidence. As we noted in Alabama v. United States, 5th Cir. 1962, 304 F.2d 583, 586, affirmed, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.

2d 112 (1962), "[i]n the problem of racial discrimination, statistics often tell much, and Courts listen." *See* Jones v. Lee Way Motor Freight, Incorporated, 10th Cir. 1970, *supra*; United States by Mitchell v. Hayes International Corporation, 5th Cir. 1969, 415 F.2d 1038, 1043; United States v. Sheet Metal Workers, 8th Cir. 1969, 416 F.2d 123, 127, n. 7; Cypress v. Newport News General & Nonsectarian Hospital Association, 4th Cir. 1967, 375 F.2d 648, 654. We believe it evident that if the statistics in the instant matter represent less than a shout, they certainly constitute far more than a mere whisper. Clearly, the figures establish a prima facie case that during the period in question race was a factor in staffing the two driver categories. *See* Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Jones v. Lee Way Motor Freight, Incorporated, 10th Cir. 1970, *supra*. Once Bing, by establishing a prima facie case of discrimination, had carried his burden of proof, it was incumbent upon Roadway to come forward and refute his case with something more than mere conclusional statements that it had never discriminated against Negroes in hiring road drivers. Turner v. Fouche, *supra*; Jones v. Lee Way Motor Freight, Incorporated, *supra*; Dailey v. City of Lawton, 10th Cir. 1970, 425 F.2d 1037. Since the Company did not refute his prima facie case, Bing was entitled to a determination that at the time he was hired the driver categories were staffed along racial lines to the extent that no Negroes would be hired as road drivers.

## ROADWAY'S NO-TRANSFER POLICY

■ We must now determine whether the application of the no-transfer rule to Bing and the members of his class constitutes an unfair employment practice in violation of 42 U.S.C.A. § 2000e–2 (a).[2] We believe the proper standard

---

2. 42 U.S.C.A. § 2000e–2(a) provides:
   It shall be an unlawful employment practice for an employer—

   (1) to fail or refuse to hire or to discharge any individual, or otherwise

to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

for measuring the validity of the policy is the test set forth in Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States, by Mitchell, 5th Cir. 1969, 416 F.2d 980, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed. 2d 100 (1970) and utilized by the Tenth Circuit in Jones v. Lee Way Motor Freight, Incorporated, *supra*: "When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, nonracial business purpose." 416 F.2d at 989. Once it has been established that an employer or union has discriminated in the past, then, the inquiry is twofold: (1) Does the present policy perpetuate the past discrimination? (2) Is the present policy justified by a showing of business necessity?

We believe the conclusion is inescapable that the effect of the no-transfer policy is to perpetuate the discriminatory effect of Roadway's past hiring policy. Because of the Company's employment practices at the time he was hired, Bing was ineligible for consideration of the job of road driver. Instead, he was relegated to the lower paying, lower status job of city driver. His subsequent endeavor to compete for the job of road driver was effectively stymied by the Company's no-transfer policy. Clearly the policy serves to perpetuate past racial discrimination by locking Bing into a job to which he was relegated by race.

In defense of the policy Roadway argues that the rule has been applied equally to both black and white employees and has prohibited transfers from the road driver unit to the city driver unit as well as from the city unit to the road unit. True though this may be, it is not a satisfactory answer to Bing's contention that in actual effect the facially neutral policy is discriminatory. Those white drivers who were employed as city drivers presumably had the opportunity to apply as road drivers but either were not qualified or preferred city work. Unlike Bing, the white drivers were not barred from the position of road driver by virtue of their race. Consequently, though the no-transfer policy may serve to keep all drivers in their present positions, the discriminatory hiring practices in effect at the time Bing was employed colors the policy, when applied to Bing and members of his class, with a distinctively discriminatory tint. Having determined that the policy perpetuates the effect of past racial discrimination, we must now consider whether the policy is justified by a showing of business necessity.

Roadway advances three reasons in support of the rule: (1) Transfers necessitate additional training costs to the Company; (2) road driving requires different skills than city driving; and (3) transfers cause labor problems because the job categories in question are covered by different union contracts. We are not persuaded that these reasons, which, to be sure, are of a business nature, may accurately be characterized as demonstrating business necessity. It is true, as to Roadway's first proffered justification, that training costs are often inherent in transfers. It is also true, however, that training costs are inherent in filling a position with a new employee rather than a transferee. Indeed, since a new employee, unlike a transferee, is not familiar with company policy and procedure, the company may incur greater training costs by utilizing him rather than a transferee. Although training a new driver to replace the transferee will also entail some costs, we do not believe the costs are substantial enough to outweigh the detriment to Bing and the members of his class of locking them in inferior positions. Roadway's second defense—that the position of road driver requires different skills

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or oth-

erwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

 

than the position of city driver—is not a compelling one. The Company's need to fill vacancies with individuals possessing the requisite skills is a valid one, but it may be satisfied by screening transferees in the same manner that new applicants are screened. The no-transfer policy, then, is not essential to the solution of the skills problem. Nor are we persuaded that Roadway's third proffered reason—that transfers may cause some personnel problems—demonstrates business necessity. It can be argued that every change in the status quo may cause personnel problems since employees with vested interests adversely affected by the change will almost certainly be displeased. We do not believe, however, that this possible effect of permitting transfers should be accorded greater weight than Bing's rights under Title VII.

In sum, then, we conclude that Roadway's no-transfer policy carries forward the discriminatory effects of the Company's former employment practices; that the no-transfer rule is not predicated upon business necessity; and that to the extent that Roadway insisted upon carrying forward exclusion of Bing and the members of his class, without business necessity, it committed, with the requisite intent, an unfair employment practice as defined by Title VII.

Section 2000e–5(g) [3] authorizes the district court to " * * * order such affirmative action as may be appropriate * * * " to remedy the effects of a party's unlawful employment practice.

Having determined that Roadway cannot use its no-transfer policy to bar Bing and the members of his class from applying for road driver positions without surrendering their current positions but, instead, must consider the applications and judge them by the same standards as all other applicants, we remand the cause to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

---

3. 42 U.S.C.A. § 2000e–5(g) provides:
  If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice). Interim earnings or amounts earnable with reasonable dili-

gence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex or national origin or in violation of section 2000e–3(a) of this title.