293 So.2d 131 (1974)
Willie Lee JORDAN, Appellant,
v.
STATE of Florida, Appellee.
No. 73-543.
District Court of Appeal of Florida, Second District.
April 19, 1974.
*132 James A. Gardner, Public Defender, and Charles H. Livingston, Asst. Public Defender, Sarasota, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Charles Corces, Jr., Asst. Atty., Gen., Tampa, for appellee.
GRIMES, Judge.
The appellant, a black man, was charged with raping a white woman. Prior to trial, appellant filed a "Motion to Exclude Jury Panel" which was grounded upon appellant's contention that the panel was selected in an unconstitutional manner.[1] Following denial of his motion, appellant was convicted and sentenced to life imprisonment.
For purposes of the hearing on appellant's motion, counsel agreed to adopt a transcript of testimony in an unrelated trial describing the manner of selecting the jury lists in Sarasota County which was utilized at the time pertinent to this case. The jury lists were made up from the voter registration cards. There were fortyfive precincts in the county. When it came time to pick a jury list, the Jury Commissioners, with no particular pattern or system, would select four or five precincts. They would then examine the voter registration cards from these precincts and determine by reference to such factors as the voter's age, occupation and felony convictions, if any, who was qualified to serve as a juror. The voter registration cards indicated the race of the voter, but the Jury Commissioners testified that this factor was given no heed.
Upon sorting out the qualified prospective jurors, the Commissioners made a master list of their names. The list was cut into uniform pieces, each containing one name. The pieces were deposited in a jury drum to be drawn out from time to *133 time as the need for a new jury venire arose. From a venire winnowed in this manner, appellant's jury was derived.
The master jury list from which appellant's jury panel came had its source in five precincts selected by the Jury Commissioners. There were four black voters registered in those precincts so, at the most, this jury list had names of four blacks among its 1344 members. The list was compiled in October 1972.[2] There was a similar dearth of black voters in the precincts which were the source of master jury lists which preceded and followed the October 1972 list.[3]
The established rule is that a defendant who contends that his jury was selected in a manner that unconstitutionally discriminated on the basis of race makes out a prima facie case by demonstrating: (1) that there was an opportunity for racial discrimination in the jury selection process; and, (2) that there was a substantial statistical disparity between the proportion of blacks selected and the proportion of blacks eligible for jury duty. Alexander v. Louisiana, 405 U.S. 625, 630-631, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). "Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, supra, at 632, 92 S.Ct. at 1226.
Appellant has shown that at the time pertinent to this appeal, 2.65% of the registered voters in Sarasota County were non-white. He has shown that, at the most, four of the 1344 (.297%) prospective jurors chosen for the October 1972 jury list were black.[4] In view of the many cases where a less disproportionate comparison was sufficient to establish this aspect of a prima facie case,[5] we are compelled to hold that appellant has demonstrated the requisite statistical dissimilitude. This leaves for consideration whether appellant has shown that there was, during the selection process, an opportunity to discriminate.
Appellant asserts that an opportunity to discriminate was presented by the fact that a voter's race was designated on the voter registration cards. In the ordinary case this would be true.[6] However, here the Jury Commissioners first selected the precincts from which jurors would be drawn. Since the precincts selected had virtually no registered black voters, the designation of race on the voter registration cards did not present an opportunity to discriminate. One does not discriminate by drawing zero black jurors out of a pool which contains zero prospective black jurors. Rather, the opportunity to discriminate existed because of the precinct selection itself in that the Jury Commissioners, as a first step in the jury selection process, could choose virtually all white precincts[7] from which to draw the names for the *134 master jury list. Prospective jurors must be selected at random, not by subjective criteria.[8] State v. Silva, Fla. 1972, 259 So.2d 153. Here, the statistical disparity originated at the point in the selection process "where the jury commissioners invoked their subjective judgment rather than objective criteria." Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970).
It should be observed at this point that the record indicates no bad faith or purposeful intention to discriminate in the jury selection process. Yet, the net effect of the system, as it related to the appellant, was that his jury panel and the venire from which it was selected (as well as the master jury list which was the ultimate source of both) were constituted as if there had been purposeful discrimination. Jury Commissioners, even those with the purest of motives, are "under a constitutional duty to follow a procedure  `a course of conduct'  which would not `operate to discriminate in the selection of jurors on racial grounds.'" Avery v. Georgia, 345 U.S. 559, 561, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953).
Apart from the due process and equal protection guarantees of the Fifth and Fourteenth Amendments, the Sixth Amendment to the U.S. Constitution guarantees the accused a trial by an impartial jury. This comprehends that in the selection process there will be "a fair possibility for obtaining a representative cross-section of the community." Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970). See State v. Silva, supra. Where a county is the political unit from which a jury is to be drawn, the right to an impartial jury drawn from a fair cross-section of the community requires that the jury be drawn from the whole county and not from some political sub-units thereof to the exclusion of others. Preston v. Mandeville, 479 F.2d 127 (5th Cir.1973). A white defendant who was charged with a crime allegedly perpetrated against a black could be similarly aggrieved if the jury list from which his venire were drawn came only from those precincts having a disproportionately high number of blacks.
We are persuaded that appellant has made a prima facie showing that the method by which his jury was selected deprived him of due process and equal protection and violated his right to an impartial jury. The burden of rebutting this showing has not been met by the State.
We are advised that Sarasota County no longer utilizes the precinct method of selecting its jury lists. Therefore, the problem should not recur in future cases. Likewise, unless the challenge to the precinct system was made and decided prior to trial in any other case, the right to object is considered to have been waived. State v. Silva, supra. We do not reach appellant's other points on appeal.
The judgment is reversed, and the case is remanded for a new trial.
MANN, C.J., and McNULTY, J., concur.
NOTES
[1] Appellant urged that the manner of jury selection violated his right to an impartial jury under the Sixth Amendment and deprived him of due process and equal protection under the Fifth Amendment as these are applied to the States by the Fourteenth Amendment to the United States Constitution. He also argued violations of Sections Nine and Sixteen of Article I of the Florida Consitution, F.S.A.
[2] A new master list was made every January and another list was made later in the year if the January list proved to be insufficient.
[3] In his brief, appellant points out this paucity with regard to the jury lists of January 1972 and January 1973. We discern from the record that there was a similar paucity with regard to the jury lists compiled in January 1971 and September 1971. The record goes no further.
[4] In his brief, appellant says that according to a computer analysis, if 1344 registered voters were selected at random from the 74,897 registered voters in Sarasota County, the chance of having no more than four blacks among the 1344 potential jurors were less than one in 10,000,000.
[5] E.g. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), (37% of grand jury list black in county which was 60% black); Preston v. Mandeville (5th Cir.1970), 428 F.2d 1392 (16% of jury roll black in county which was 29.3% black).
[6] E.g. Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967).
[7] Only one precinct was more than 50% black. One was almost 50% black. Two were more than 10% black and eight others ranged from approximately .1% to 3% black. Thirty-three precincts had no black voters.
[8] One of the Commissioners testified that he tried to avoid choosing precincts which had been used within the past three years. However, the record reflects that one all white precinct and one precinct with only four blacks each appeared twice over the period of three consecutive jury lists comprising just thirteen precincts.