**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, | No.  47581-2-II |
| Respondent, | |
| v. | |
| WYATT TAYLOR SEWARD, | PUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Wyatt Taylor Seward appeals the imposition of legal financial obligations (LFOs) following his guilty plea conviction for second degree assault.  He argues that (1) the imposition of mandatory LFOs under RCW 43.43.7541 (deoxyribonucleic acid (DNA) collection fee), RCW 7.68.035 (victim penalty assessment (VPA)), and RCW 36.18.020(2)(h) (filing fee) without first considering his current or likely future ability to pay violated his substantive due process rights, (2) the LFO collection process does not comply with the constitutional safeguards established in *State v. Blank*, 131 Wn.2d 230, 930 P.2d 1213 (1997), and (3) RCW 10.01.160(3) applies to the DNA collection fee, the VPA, and the filing fee even though

they are mandatory. He also requests that we not impose appellate costs.[1] We reject Seward's

arguments and affirm the LFOs, but we exercise our discretion to not impose appellate costs.

FACTS

On March 6, 2015, Seward pleaded guilty to a second degree assault charge. During the

plea colloquy, Seward's counsel requested that the trial court delay the sentencing hearing until

May 1 because Seward, who had a wife and two children and was currently employed, needed to

"get his affairs in order." Report of Proceedings (RP) (Mar. 6, 2015) at 12.

At the May 1 sentencing hearing, the State requested that the trial court impose the $500

VPA, the $100 DNA collection fee, and $200 in "court costs." RP (May 1, 2015) at 9. The State

did not ask the trial court to impose any other LFOs.

The trial court imposed a 120-month sentence. It also ordered Seward to pay a total of

$800 in mandatory LFOs: (1) a $200 criminal filing fee under RCW 36.18.020(2)(h),[2] (2) a $500

---

[1] Although Seward did not make this request in his original briefing, he has moved for permission
to include this issue. We grant this motion and consider whether to impose appellate costs below.
  Seward also argues in his supplemental brief that the filing fee was a discretionary fee
subject to RCW 10.01.160(3). Seward did not raise this issue in his original briefing. Seward has
not moved for permission to raise this additional issue. Accordingly, we do not address this newly-
raised issue.

[2] RCW 36.18.020(2)(h) provides,
    Upon conviction or plea of guilty, upon failure to prosecute an appeal from a court
    of limited jurisdiction as provided by law, or upon affirmance of a conviction by a
    court of limited jurisdiction, an adult defendant in a criminal case *shall be liable
    for* a fee of two hundred dollars.
(Emphasis added.) The legislature amended RCW 36.18.020(2)(h) in 2015, changing the phrase
"a defendant in a criminal case" to "an adult defendant in a criminal case." LAWS OF 2015, ch.
265 § 28. Because this amendment does not affect this case, we cite to the current version of the
statute.

No. 47581-2-II

VPA under RCW 7.68.035,[3] and (3) a $100 DNA collection fee under RCW 43.43.7541.[4]  The

trial court later imposed $28,563.84 in restitution.  There is nothing in the record showing that

Seward objected to any LFOs.  Nor is there anything in the record showing that the trial court

considered Seward's current or potential future ability to pay any LFOs.  Seward appeals his LFOs.

ANALYSIS

I.  DUE PROCESS

Seward argues that the imposition of mandatory LFOs under RCW 43.43.7541, RCW

7.68.035, and RCW 36.18.020(2)(h), without first establishing that he had or will have the ability

to pay, violated his substantive due process rights because there is no rational basis for imposing

costs against those who cannot pay.  We disagree.[5]

---

[3] RCW 7.68.035(1)(a) provides,
> When any person is found guilty in any superior court of having committed a crime,
> except as provided in subsection (2) of this section, there *shall* be imposed by the
> court upon such convicted person a penalty assessment.  The assessment shall be
> in addition to any other penalty or fine imposed by law and shall be five hundred
> dollars for each case or cause of action that includes one or more convictions of a
> felony or gross misdemeanor and two hundred fifty dollars for any case or cause of
> action that includes convictions of only one or more misdemeanors.

(Emphasis added.)  The legislature amended RCW 7.68.035 in 2015.  LAWS OF 2015, ch. 265 § 8.
Because this amendment is not relevant to the issues in this case, we cite to the current version of
the statute.

[4] RCW 43.43.7541 provides in part,
> Every sentence imposed for a crime specified in RCW 43.43.754 *must* include a
> fee of one hundred dollars.  The fee is a court-ordered legal financial obligation as
> defined in RCW 9.94A.030 and other applicable law.

(Emphasis added.)  The legislature amended RCW 43.43.7541 in 2015.  LAWS OF 2015, ch. 265 §
31.  Because this amendment is not relevant to the issues in this case, we cite to the current version
of the statute.

[5] We exercise our discretion under RAP 2.5 to address this issue.  *See State v. Blazina*, 182 Wn.2d
827, 834-35, 344 P.3d 680 (2015) ("RAP 2.5(a) grants appellate courts discretion to accept review
of claimed errors not appealed as a matter of right.").

3

A. LEGAL PRINCIPLES

Statutes are presumed constitutional, and it is Seward's burden to establish that a due process violation occurred. *State v. McCuistion*, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012); *Blank*, 131 Wn.2d at 235. We review alleged due process violations de novo. *State v. Mullen*, 171 Wn.2d 881, 893, 259 P.3d 158 (2011).

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 3 of the Washington Constitution mandate that no person may be deprived of life, liberty, or property without due process of law. Where, as here, the interests at stake are not fundamental rights,[6] we apply the most lenient and highly deferential review standard—the rational basis standard. *Nielsen v. Dep't of Licensing*, 177 Wn. App. 45, 53, 309 P.3d 1221 (2013).

Under rational basis review, we determine whether a rational relationship exists only between the challenged law and a legitimate state interest. *Nielsen*, 177 Wn.2d at 53. In applying this standard, we may "'assume the existence of any necessary state of facts which [we] can reasonable conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest.'" *Nielsen*, 177 Wn.2d at 53 (alteration in original) (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 222, 143 P.3d 571 (2006)). Unlike when we apply strict scrutiny, narrow tailoring is not required under a rational basis review. *See Nielsen*, 177 Wn.2d at 53.

---

[6] The parties agree that no fundamental right is at issue.

## B. RATIONAL BASIS

Seward acknowledges that (1) the DNA collection fee serves the legitimate state interest of funding the collection, analysis, and retention of convicted offenders' DNA profiles to facilitate future criminal identifications, (2) the VPA serves the legitimate state interest of funding comprehensive programs to encourage and facilitate testimony by victims and witnesses of crimes, and (3) the filing fee serves the legitimate state interest in compensating the court clerks for their official services. But Seward argues that imposing the fees on offenders without first determining whether the offenders have the current or potential future ability to pay does not rationally serve these interests. He argues it is unlikely the fees will be collected if the offender does not have the ability to pay, and imposing and attempting to collect fees and assessments from those who cannot pay is harmful to the offenders, creates no legitimate economic incentive, and serves no legitimate purpose.

We hold that the DNA collection fee, the VPA, and the filing fee are rationally related to the legitimate state interests described above in two ways. First, imposing these fees and the assessment on all felony offenders without first considering their ability to pay is rationally related to legitimate state interests because even though some offenders may be unable to pay, some will. So the imposition of these fees and assessments on all offenders creates funding sources for these purposes.

Second, imposing these fees and the assessment on offenders who may be indigent at the time of sentencing is also rationally related to funding these purposes because the defendant's indigency may not always exist. We can conceive of situations in which an offender who is indigent at the time of sentencing will be able to pay the fees and assessments in the future. So it

is not unreasonable to believe that imposing these fees and assessments on all indigent offenders would result in some funding for these purposes. Accordingly, Seward fails to show that there is no rational relationship between imposing these mandatory fees and assessments against all offenders, and his due process argument fails.[7]

## II. COMPLIANCE WITH *BLANK*'S CONSTITUTIONAL SAFEGUARDS

Seward next argues that the current LFO schemes do not meet the "necessary constitutional safeguards established in *Blank*." Br. of Appellant at 10. He argues that *Blank* established that the constitutionality of Washington's LFO statutes depended on the trial court conducting an ability to pay inquiry at certain key points. First is when collection has begun and sanctions are sought for nonpayment. Second is when the State seeks to impose an additional penalty for failure to pay. And third is before enforced collection or any sanction is imposed for nonpayment. He contends that under the current collection schemes, payment, interest, and penalties can commence immediately after sentencing, so the court must conduct the ability to pay analysis at sentencing.

In *Blank*, our Supreme Court held that "before enforced collection or any sanction is imposed for nonpayment, there must be an inquiry into ability to pay." 131 Wn.2d at 242. *Blank* does not, however, require that the inquiry into ability to pay take place before the LFOs are imposed in a judgment and sentence. Although Seward asserts that enforced collections and sanctions immediately follow the entry of the judgment and sentence, nothing in the record

---

[7] Although previous cases, *State v. Curry*, 118 Wn.2d 911, 917-18, 829 P.2d 166 (1992), and *State v. Mathers*, 193 Wn. App. 913, 918-21, 376 P.3d 1163 (2016), *review denied*, No. 93262-0 (Wash. Sept. 28, 2016), address and reject similar due process arguments, neither of these cases address the exact argument Seward presents—whether imposing mandatory fees or assessments on defendants before determining whether they have the current or likely future ability to pay these fees rationally serves the State's legitimate interests.

supports this argument.[8]  Because the record does not support Seward's assertions, this argument

fails.

### III.  APPLICATION OF RCW 10.01.160(3)

Seward further argues that the trial court erred in failing to comply with RCW

10.01.160(3)'s requirement that the court consider the offender's ability to pay before imposing

the LFOs.  He contends that although the DNA collection fee, the VPA, and the filing fee statutes

purport to impose mandatory fees and assessments, "these [statutes] must be harmonized with

RCW 10.01.160(3)."  Br. of Appellant at 19.  We disagree.

We have rejected this identical argument insofar as it relates to the DNA collection fee and

the VPA in *State v. Mathers*, 193 Wn. App. 913, 918-21, 376 P.3d 1163 (2016), *review denied*,

No. 93262-0 (Wash. Sept. 28, 2016).  Furthermore, although *Mathers* does not address the filing

fee, we hold that the same analysis applies with equal force.  Thus, for the reasons stated in

*Mathers*, this argument fails.

### IV.  APPELLATE COSTS

Finally, in his supplemental brief, Seward argues that if the State requests appellate costs,

we should deny the request.  He notes that (1) he was appointed counsel because of his indigency,

(2) he received a 120-month sentence, (3) "it is reasonable to presume he remains indigent

throughout this review," (4) he owes more than $28,000 in restitution, and (5) imposing additional

obligation of appellate costs will unjustly increase his financial burden.  Suppl. Br. of Appellant at

10.  The State responds that there is no basis to waive appellate costs.

---

[8] For instance, there is no notation on the judgment and sentence showing that Seward was required to start paying his LFOs.

No. 47581-2-II

In light of Seward's current indigent status, our presumption under RAP 15.2(f) that he remains indigent "throughout the review" unless the trial court finds that his financial condition has improved, and the fact that he will have significant debt due to the restitution award upon his release, we exercise our discretion and waive appellate costs.  RCW 10.73.160(1).[9]

We affirm the imposition of the mandatory LFOs and waive appellate costs.

JOHANSON, J.

I concur:

LEE, J.

---

[9] The legislature amended RCW 10.73.160(1) in 2015.  LAWS OF 2015, ch. 265, § 22.  This amendment removed references to juvenile offenders and is not relevant to our analysis.  Accordingly, we cite to the current version of the statute.

BJORGEN, C.J. (dissenting) — I part with the majority opinion in its analysis of the substantive due process challenge to mandatory legal financial obligations (LFOs). Therefore, I dissent.

The majority rightly centers its substantive due process analysis on the highly deferential rational basis test.[10] The basic demand of the test is a rational relationship between the challenged law and a legitimate state interest. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 222, 143 P.3d 571 (2006). In making this determination, we may assume the existence of any necessary state of facts which can reasonably be conceived. *Id.*

The central purpose of mandatory LFOs is to raise money to help fund certain elements of the criminal justice system, without doubt a legitimate state interest. Imposing these obligations on those with ability to pay plainly serves that interest. On the other hand, requiring monetary payments from those who cannot and will not be able to pay them does nothing to serve that purpose. Without a *Blazina*-like[11] individualized determination of ability to pay, these mandatory assessments generate obligations having no reasonable relationship to their purpose.

The majority analysis would salvage a reasonable relationship through a type of dragnet rationale: because these assessments would be imposed on some who can pay, their imposition on those who cannot serves the purpose of raising money. In a temporal variant of the same approach, the majority analysis also argues that imposing these obligations on those who cannot pay serves the same purpose, because they may be able to pay at some point in the future.

---

[10] The notion of substantive due process appears in different guises in the case law. In this appeal it centers on whether the rational basis test is met.

[11] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).

The rational basis test does allow us to posit any reasonably conceivable state of facts in finding the needed rational relationship. Thus, we posit that some, perhaps even many, who are assessed mandatory LFOs can and will pay, which plainly serves the purpose of raising money. Similarly, we may guess that some who lack the ability to pay now may find that ability on some hoped for day in the future.

However, a license to engage in a *gedankenexperiment* to discover ways in which a measure could serve a purpose is not a license to impose that measure in ways that do nothing to serve the purpose and which, in fact, work against that purpose. Without the individualized determination required by *Blazina* for discretionary LFOs, mandatory LFOs will be imposed in many instances on those who have no hope of ever paying them. In those instances, the levy of mandatory LFOs has no relation to its purpose. In those instances, the only consequence of mandatory LFOs is to harness those assessed them to a growing debt that they realistically have no ability to pay, keeping them in the orbit of the criminal justice system and within the gravity of temptations to reoffend that our system is designed to still. Levying mandatory LFOs against those who cannot pay them thus increases the system costs they were designed to relieve. In those instances, the assessment of mandatory LFOs not only fails wholly to serve its purpose, but actively contradicts that purpose. The self-contradiction in such a system crosses into an arbitrariness that not even the rational basis test can tolerate.

The rational basis test, of course, does not demand the same tailored relationship between means and purpose typically required in strict scrutiny. As noted, a rational relationship between the challenged law and a legitimate state interest is all the rational basis test requires. *Amunrud*, 158 Wn.2d at 222. Further, under the rational basis test a law may address only part of the

societal problem it is directed against. *See Ry. Express Agency v. People of State of New York*, 336 U.S. 106, 110, 69 S. Ct. 463, 93 L. Ed. 533 (1949).

The majority's dragnet rationales, though, are something entirely different. These rationales attempt to save a law that contradicts its purpose in some instances by pointing out that the law will serve its purpose in others or by hypothesizing that the contradiction may someday cease. This contradiction between purpose and effect in some instances is not effaced by its absence in others. Nor is the contradiction relieved by the doubtful hope that it may some day pass away. These uses of the imagination are far removed from positing different ways in which a law may serve its purpose, which is the sort of speculation invited by the rational basis standard.

Although rational basis review is highly deferential, courts have invalidated legislation under it where the purported rationale for challenged legislation is too attenuated or irrational in light of the legislation's effect. In *Turner v. Fouche*, the United States Supreme Court considered an equal protection challenge to a Georgia statute limiting school board membership to freeholders, those owning some real property. 396 U.S. 346, 361-62, 90 S. Ct. 532, 24 L. Ed. 2d 567 (1970). In the face of the parties' dispute over the proper standard of review, the court noted that the "freeholder requirement must fall even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective." *Id*. at 362. The court reasoned:

> Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold. Whatever objectives Georgia seeks to

11

> obtain by its "freeholder" requirement must be secured, in this instance at least, by means more finely tailored to achieve the desired goal.

*Id*. at 364 (internal footnotes omitted).

Although *Turner* dealt with an equal protection challenge, the essence of the rational basis standard is unchanged. The speculation that offended that standard in *Turner* is different from that entertained by the majority here in its specifics but not in its nature. The majority's approach lacks that rudimentary fit that *Turner* required under rational basis review. Perhaps more to the point, if the hypothesizing of the majority approach is sufficient to relieve the contradictions in assessing mandatory LFOs with no consideration of ability to pay, then the rational basis test must tolerate the irrationality of clearly antagonistic purpose and effect. That irrationality itself contradicts the core of the rational basis test.

For these reasons, I would conclude that the assessment of mandatory LFOs with no inquiry into ability to pay fails the rational basis test.

_____
BJORGEN, C.J.