443 So.2d 78 (1983)
Lucious ANDREWS, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 60584.
Supreme Court of Florida.
December 8, 1983.
*79 Michael E. Allen, Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Jim Smith, Atty. Gen. and Lawrence A. Kaden, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This is an appeal from a final judgment of the Circuit Court of Leon County imposing the death penalty. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. The offense was sexual battery upon a person under the age of eleven years by a person eighteen or more years of age. § 794.011(2), Fla. Stat. (1979). For the following reason, we reverse appellant's conviction and vacate the sentence which has been imposed upon him.
The victim testified in court as follows: Appellant was asked by the victim, Quinezett Bryant, aged eight, to take her to the store one evening. Appellant drove the victim to the store and purchased popcorn and bubble gum for her. He then drove *80 her home and parked his car in front of the victim's house. Allegedly, appellant pushed the victim down in the seat of the car, pushed her panties aside, and attempted to insert his penis into her anus. She suffered pain in the anal area due to three small tears in the anal tissue. Appellant then discontinued the attempt at penetration. The victim's sister, Tonya, came out to the car looking for her sister and told her to go inside the house. The victim went to the bathroom and "felt something come out." She didn't know what it was but it was white; she flushed it down the toilet. The victim then washed her panties and went to sleep.
The next morning, the victim's mother questioned the girl about her outing from the house and learned of the sexual battery. The victim was taken to the hospital where an examination found three shallow or superficial lacerations around the anus. Medical swabs were also taken of the anal area and these were later determined to contain some amounts of blood but no semen. Chemical testing of the victim's panties, gown and robe revealed no semen present.
Jury trial commenced on April 7, 1981. The state's witnesses were the victim, her sister, the emergency room physician, the investigating officer, a forensic serologist, and the victim's mother. Appellant's witnesses were a sheriff's deputy, a state's attorney investigator, a lab technician, the victim's father, the victim's mother, three character witnesses, and the appellant.
On April 8, 1981, the jury returned a verdict of guilty of the offense charged.
On April 30, 1981, the sentencing phase was conducted. The state presented no additional evidence and said it was not seeking the death penalty. Appellant called several character witnesses as well as the victim's mother in mitigation. The jury recommended life imprisonment as a sentence. The jury foreman made a statement to the court that the jury unanimously felt that even the life sentence "is more severe than the particular circumstances involved in this case." Immediately thereafter, the trial judge overrode the jury's recommendation and imposed a sentence of death.

I
Andrews, who is black, initially contends that the trial court erred in denying his motion to dismiss the indictment against him, which motion alleged that black citizens of Leon County had been systematically excluded from serving as grand jury foremen. He does not challenge the racial composition of the grand juries empaneled in Leon County.
First, applying the principles announced by the Supreme Court in Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and reaffirmed as they apply to the selection of a Tennessee grand jury foreman in Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), we find that the trial court correctly denied Andrews' motion to dismiss.
In Rose the Supreme Court held that in order to show that an equal protection violation has occurred in the context of grand jury foremen selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The Court then said that a defendant was required to prove a prima facie case of discrimination in the selection of a grand jury foreman as follows:
The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied... . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time... . This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class... . Finally ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption *81 of discrimination raised by the statistical showing. [Castaneda v. Partida, 430 U.S. at 494, 97 S.Ct. at 1280.]
443 U.S. at 565, 99 S.Ct. at 3005. Only after the defendant in this manner establishes a prima facie case of discrimination does the burden shift to the state to rebut that prima facie case.
Assuming, for the purposes of analysis only, that Andrews established that he is a member of a group recognizable as a distinct class capable of being singled out for different treatment under the laws, that the selection procedure is susceptible of abuse, and that there has been a degree of underrepresentation of blacks as grand jury foremen over a significant period of time, this would establish a prima facie case of discrimination under the Rose test, and the burden would shift to the state to rebut the presumption of discrimination.
The state then would have the burden of showing that racially neutral selection procedures produced the disparity established by Andrews. In its order denying the motion to dismiss, the trial court found that:
Every circuit judge involved with the selection of grand jury foremen in Leon County during the critical period, who testified, gave the specific criteria he used in selecting a grand jury foreman. Each denied that race was one of these criteria. Leadership and ability to preside over the deliberations seem to be the most common and persuasive criteria used.
In an analogous case, the United States Court of Appeals, Eleventh Circuit, in United States v. Perez-Hernandez, 672 F.2d 1380 (11th Cir.1982), addressed the issue of alleged discrimination in the Southern District of Florida in the selection of a federal grand jury foreman where the defendant had made a prima facie case of discrimination. It reiterated the principles announced in Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), and Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970), that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case and that denial of a discriminatory intent will not suffice. It held, however, that the government had rebutted the defendant's case of discrimination. In reaching this conclusion, the Eleventh Circuit stated:
The government's rebuttal case below consisted entirely of testimony from eight district judges involved in the foreman selection process for the years in question. Each judge testified that he acted independently of the other judges in choosing a grand jury foreman, although each employed similar guidelines in making a selection. These guidelines generally consisted of four separate factors: (1) occupation and work history; (2) leadership and management experiences; (3) length of time in the community; and (4) attentiveness during the jury empanelment. These factors directly relate to the ability to perform the administrative functions and duties of a grand jury foreman. This is not then a case in which arbitrary and unrelated criteria operated to exclude distinct groups from a position.... We can think of no better criteria for determining which grand jury member is best able to serve as foreman.
672 F.2d at 1387-88 (footnotes omitted) (citation omitted). The criteria used by the federal judges in the Southern District of Florida were for the most part the same ones used by the circuit judges in Leon County in selecting grand jury foremen. As was the case in Perez-Hernandez, the record in the present case does not show that these judges abused their discretion by selecting foremen without regard to their stated criteria or by excluding equally qualified blacks.
The Eleventh Circuit also reached the same result in a case from the Northern District of Florida. United States v. Holman, 680 F.2d 1340 (11th Cir.1982). In that case the defendants sought reversal because of alleged discrimination in selection of the grand jury foreperson. During the relevant period from 1969 to 1979, only one black female was appointed to that position in the Northern District of Florida. *82 Circuit Judge Hatchett of the Eleventh Circuit, who was sitting by designation as the trial judge, denied the defendants' motion to dismiss the indictment. Finding that a prima facie case of discrimination had been established, Judge Hatchett nevertheless concluded that the government had met its burden of rebutting the defendants' case. United States v. Holman, 510 F. Supp. 1175 (N.D.Fla. 1981). On appeal, the Eleventh Circuit, accepting Judge Hatchett's conclusion that a prima facie case had been made, affirmed his ruling that it was rebutted by the government's proof of a lack of discriminatory intent. In reaching this decision, the court said: "Both judges of the Northern District of Florida who testified at the hearing and in deposition asserted that their selections were rendered with no view to the jurors' race or sex; Judge Stafford stated that he was unaware that the jurors' race was even indicated on the questionnaire." 680 F.2d at 1357.
If the federal district judges of the Southern District of Florida in Perez-Hernandez and of the Northern District of Florida in Holman acted properly in selecting grand jury foremen, then certainly the circuit judges of Leon County did also. Just as in the federal cases, this is not a case in which arbitrary and unrelated criteria operated to exclude distinct groups from a position. The record in this case clearly establishes that the circuit judges in Leon County were "color blind" in their selection of grand jury foremen and that the criteria they used in their selection were racially neutral.
Next, even though for the purposes of analysis we have applied the principles in Rose to show that the foreman selection process did not violate the equal protection clause of the fourteenth amendment, we question whether Rose is applicable to Florida's grand jury foreman selection process. Judge Morgan, in his specially concurring opinion in Perez-Hernandez, concludes that the Supreme Court's holding in Rose does not apply to the selection of grand jury foremen in the federal system. For the same reasons expressed by Judge Morgan, it also does not apply to Florida's grand jury foreman selection process. Judge Morgan contends that before a defendant may challenge his indictment because of discrimination in the judicial system, the discrimination should be related to a significant position in the administration of justice. He points out that the federal grand jury foreman is not such a significant position and that there are material differences between the role of the federal grand jury foreman and that of the Tennessee grand jury foreman involved in Rose. Selection of the federal foreman, he asserts, is not even remotely necessary to the administration of justice since he or she performs only menial, insignificant tasks and has no more power than any member of the grand jury panel. In the federal system, the grand jury is randomly selected and then a foreman and deputy foreman are selected by the court from that group. The federal foreman administers oaths, signs the indictments, and he or another member of the grand jury whom he designates keeps the records. Fed.R.Crim.P. 6(c).
The grand jury foreman in Tennessee, on the other hand, plays an independently significant role in the administration of justice. The Supreme Court in Rose detailed the selection process and the functions of a grand jury foreman in Tennessee. 443 U.S. at 548 n. 2, 99 S.Ct. at 2996 n. 2. He or she is chosen by a judge from the entire population for a two-year term of office and is then added to a randomly selected grand jury panel as a thirteenth member. This procedure allows discrimination in the selection of the foreman to infiltrate discrimination into the entire grand jury panel. The Tennessee grand jury foreman plays an essential role in the administration of justice in that he or she is charged with the duty of assisting the district attorney in investigating crime and may order the issuance of subpoenas for witnesses before the grand jury. Without his or her endorsement, an indictment is fatally defective.
The selection process and duties of the grand jury foreman in Florida courts *83 are analogous to the federal court system. Both are unlike the grand jury foreman in the Tennessee state court system. In Florida, the court selects one of the grand jurors as foreman and another to act as foreman during the absence of the foreman from a randomly selected grand jury. § 905.08, Fla. Stat. (1981). The Florida foreman plays no more significant a part in the proper administration of justice than does the federal grand jury foreman. He administers oaths to witnesses, appoints one of the members of the grand jurors as clerk to keep minutes of the proceedings, appoints interpreters to translate language of witnesses, and either he or an acting foreman signs the indictment. §§ 905.22, 905.13, and 905.15, Fla. Stat. (1981); Fla.R. Crim.P. 3.140(f). Therefore, even if there had been discrimination in the selection of the grand jury foreman in Leon County, which there was not, it would not have justified quashing the indictment and certainly does not require setting aside the conviction.
Finally, the applicability of the test announced in Rose to the Florida foreman selection process is questionable on another basis. In light of the fact that the Florida grand jury foreman is chosen from the randomly selected grand jury rather than selected from the entire population and then added as an additional member to the panel, the second criteria announced in Rose for establishing a prima facie case of discrimination, i.e., that the degree of underrepresentation may be proved by comparing the proportion of the group in the total population to the proportion called to serve as foreman over a significant period of time, is inappropriate in the present case. Rather, we should compare the proportion of the group in grand jury panels to the proportion called to serve as foremen. Thus the trial court was correct when it concluded:
5. There is no evidence of nor challenge to the racial composition of the grand juries empaneled in Leon County during the critical period.
6. If the selection of the grand juries was racially neutral as we must assume it was, it could result in a racial composition disproportionate to the population without being constitutionally objectionable.
7. Statistical calculations based on a comparison of the number of black grand jury foremen selected to the number of blacks in the general population are not competent to establish a systematic and deliberate exclusion of blacks from that position without a showing as to the number of blacks from which the selection was made; i.e., the grand jury panel.
8. The defendants did not in this Court's opinion establish a prima facie case of discrimination under the "rule of exclusion."
Based on the foregoing analyses, we hold that the trial court correctly denied Andrews' motion to dismiss the indictment.

II
Appellant's second point, however, raises an issue which indeed rises to the level of reversible error and causes us to set aside the conviction. Appellant claims that the trial court committed reversible error when it denied appellant's motion for a mistrial after the court had commented, without request and without cautionary instruction, upon appellant's right to decline to testify. With this we agree.
In its opening instructions to the jury, the trial court said, inter alia:
The Defense may or may not call witnesses. The Defense is not required to call any witnesses nor is the defendant required to take the stand.
Defense counsel promptly moved for a mistrial alleging improper comment by the court upon the defendant's right not to testify and not to take the stand. The state was not unsympathetic to the mistrial motion but the trial court denied it. Trial was held and appellant testified in his own behalf.
The Florida Standard Jury Instructions in Criminal Cases that was applicable at *84 the time of appellant's trial provided for the following preliminary instruction:
The defendant may or he may not testify during the trial. At no time is a defendant in a criminal case required to prove his innocence or furnish any evidence whatsoever. This right is guaranteed to all defendants by the Constitution and no other right is more thoroughly ingrained in our system of justice. The decision to testify or not testify is his alone to make, and a jury cannot draw any inference of guilt whatsoever from the failure of a defendant to take the witness stand in his own defense.
Fla.Std.Jury Inst. (Crim.) 1.01. A footnote referring to this instruction says:
The above is to be given only with consent of defendant.
Fla.Std.Jury Inst. (Crim.) 1.01, n. 1.
The giving of similar instructions over the objection of the defendant is not error. Carlton v. State, 111 Fla. 777, 149 So. 767 (1933); Fogler v. State, 96 Fla. 68, 117 So. 694 (1928); Harvey v. State, 187 So.2d 59 (Fla. 4th DCA), cert. denied, 194 So.2d 619 (Fla. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 894, 17 L.Ed.2d 795 (1967). See also Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). However, the trial court in the instant case omitted any cautionary instruction to the jury not to draw any inference of guilt from the defendant's failure to take the stand in his own defense. That omission is most significant. As the United States Supreme Court noted in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981):
The significance of a cautionary instruction was forcefully acknowledged in Lakeside, where the Court found no constitutional error even when a no-inference instruction was given over a defendant's objection. The salutary purpose of the instruction, "to remove from the jury's deliberations any influence of unspoken adverse inferences," was deemed so important that it there outweighed the defendant's own preferred tactics.
450 U.S. at 301, 101 S.Ct. at 1119-1120 (footnote omitted). Without the cautionary instruction, the jurors were free to infer or speculate that a defendant who does not testify must surely be guilty, otherwise he would take the stand in his own behalf. A bald judicial comment on the refusal to testify, by itself, "is a remnant of the `inquisitorial system of criminal justice'... . It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232-33, 14 L.Ed.2d 106 (1965) (footnote and citations omitted). But the cautionary no-inference instruction's "very purpose is to remove from the jury's deliberations any influence of unspoken adverse inferences." Lakeside v. Oregon, 435 U.S. at 339, 98 S.Ct. at 1095.[1]
The fact that appellant did later testify does not remedy the error committed by the trial court. The fatal instruction effectively deprived appellant of the opportunity to make his decision whether or not to testify "in an atmosphere free of coercion or intimidation." Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). Whereas in Provence there was little doubt that from the outset the defense intended to put the defendant upon the stand (in order to present a self-defense argument to balance the picture of the deceased's body with its eight stab wounds), here the record does not suggest that it was appellant's intention from the outset of his trial to testify. The state's case consisted basically of the testimony of a young child. It could easily have been defense counsel's trial strategy not to have the defendant testify and argue the total *85 unreliability of the young child's testimony. Defense counsel may very well have concluded that the absence of a cautionary instruction effectively eliminated any free choice he may otherwise have had on the matter of defendant's testifying or electing to remain silent. Thus, an impermissible element of coercion was present in the instant case, and this was sufficient, we believe, to deprive appellant of his right to make his decision about testifying in a free and principled manner.
We thus conclude that the trial court's comment, over appellant's objection, with no cautionary no-inference instruction, should have been the basis for the court's granting the motion for mistrial. Since the motion was not granted, we hereby reverse appellant's conviction and vacate his sentence. Upon retrial, appellant may not be subject to the death penalty for this crime. Coler v. State, 418 So.2d 238 (Fla. 1982), cert. denied, ___ U.S. ___, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983); Buford v. State, 403 So.2d 943 (Fla. 1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982).
It is so ordered.
OVERTON and McDONALD, JJ., concur with Part I and II.
ALDERMAN, C.J., and BOYD, J., concur with Part I and dissent with Part II with opinions.
SHAW, J., concurs with Part II and dissents with Part I with an opinion, with which ADKINS and EHRLICH, JJ., concur.
ALDERMAN, Chief Justice, concurring in part, dissenting in part.
I concur that the trial court correctly denied Andrews' motion to dismiss the indictment. I also agree that Andrews may not be subject to the death penalty for the crime for which he was convicted. I dissent, however, to the reversal of Andrews' conviction on the basis that the trial court erred in denying Andrews' motion for mistrial after the trial court had instructed the jury on Andrews' right not to testify.
The trial court did not reversibly err in instructing the jury as to Andrews' right not to testify. In the context of its opening explanation to the jury as to how a criminal trial proceeds, the trial court said:
The Defense may or may not call witnesses. The Defense is not required to take the stand. In a criminal case the State is required to prove its case beyond and to the exclusion of a reasonable doubt. I will instruct you at a later time to what reasonable doubt is. It is not a complicated physics formula or any engineering type of formula. It is simply one that will be of a common sense explanation.
This was not an improper comment on the possible failure of Andrews to testify but merely supplemented the presumption of innocence charge and emphasized that the burden in a criminal case is upon the state to prove its case beyond and to the exclusion of a reasonable doubt. It was not an adverse comment on defendant's failure to testify and certainly did not amount to an instruction that a defendant's silence is evidence of guilt and therefore was not constitutionally proscribed. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The comment did not violate Andrews' constitutional privilege against compulsory self-incrimination since there was no element whatsoever of compulsion in the trial court's opening instruction. In Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), the Supreme Court reemphasized that the concern of the Court was with adverse comment on a defendant's refusal to testify and expressly stated that although it may be wise for a trial court not to give a cautionary instruction relating to a defendant's right not to testify over a defendant's objection, "[w]e hold only that the giving of such an instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." *86 435 U.S. at 340-41, 98 S.Ct. at 1095 (footnote omitted).
We are not here dealing with a request by a defendant for a cautionary instruction to a jury that they should not draw adverse inferences from his failure to testify as was the case in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). In that case the defendant had requested a court instruction that the jury not draw inferences from defendant's failure to testify. The Supreme Court held that the defendant, upon request, had the right to have the trial court give this instruction in order to minimize the danger that the jury would give evidentiary weight to his failure to testify. It is reversible error to refuse to give this cautionary instruction where defendant requests it, but, as the majority expressly recognizes, it is not reversible error to give it over a defendant's objection. Carlton v. State, 111 Fla. 777, 149 So. 767 (1933); Fogler v. State, 96 Fla. 68, 117 So. 694 (1928); Mosley v. State, 402 So.2d 559 (Fla. 1st DCA 1981).
In the present case, Andrews chose to take the stand and to testify. The judge's instruction was not adverse to him, and his argument that the comment coerced him to testify is without merit. I find no reversible error in the trial court's giving this instruction.
I find that Andrews' other point relating to his conviction is also without merit. Accordingly, I would affirm his conviction, but would vacate his death sentence and remand with directions to reduce his sentence to life imprisonment, with the requirement that he serve no less than twenty-five years before becoming eligible for parole.
BOYD, Judge, concurring in part and dissenting in part.
I concur with Part I of the majority opinion, holding that the trial court correctly denied appellant's motion to dismiss the indictment. I also agree that even though the offense of sexual battery by an adult upon a young child as defined by statute is designated a capital offense under Florida law, a sentence of death may not be imposed for such crime. I dissent to Part II in which the majority orders a new trial on the ground of improper comment on the defendant's right not to testify. I agree with Chief Justice Alderman's view that there was no such improper comment. I therefore dissent to the order of a new trial. I would grant relief to appellant, however, on the ground, not raised in his brief, that because of the paucity of evidence of the crime of sexual battery, we should in the interest of justice reduce the severity of the conviction to attempted sexual battery.
Regarding the argument that appellant was indicted by a grand jury selected by a system that purposely excludes black citizens from the position of grand jury foreman, I agree with Part I of the majority opinion holding that the argument does not entitle appellant to a new trial. I believe that the exclusion of black citizens from any position in our legal system or society in general, including grand jury foreman, is intolerable. We in the judiciary should continue in our efforts to remedy any such exclusionary tendencies and to ensure that black citizens fully participate in all phases of the judicial process. However, where the evidence is sufficient and the trial is fair a conviction should not be reversed on the ground of racially disparate participation in the position of grand jury foreman unless it be shown that there was intentional racial discrimination in the selection of persons for such position. Here there was a sufficient showing that the inequality in service by black citizens as grand jury foreman was not the result of intentional discrimination. See United States v. Cabrera-Sarmiento, 533 F. Supp. 799 (S.D.Fla. 1982); United States v. Breland, 522 F. Supp. 468 (N.D.Ga. 1981); United States v. Manbeck, 514 F. Supp. 141 (D.S.C. 1981); United States v. Holman, 510 F. Supp. 1175 (N.D.Fla. 1981); United States v. Jenison, 485 F. Supp. 655 (S.D.Fla. 1979); State v. Garrett, 627 S.W.2d 635 (Mo. 1982) (en banc). Therefore I agree that the trial *87 court did not err in denying the motion to dismiss the indictment.
Regarding the appellant's argument that the court improperly commented on his right not to testify, I believe that clear legal authority and an examination of the record show that this argument is completely without merit. The court instructed the jury as follows:
The Defense may or may not call witnesses. The Defense is not required to call any witnesses nor is the Defendant required to take the stand. In a criminal case the State is required to prove its case beyond and to the exclusion of a reasonable doubt. I will instruct you at a later time to what reasonable doubt is. It is not a complicated physics formula or engineering type of formula. It is simply one that will be of a common sense explanation.
Such a comment on a defendant's right not to testify "merely supplements the `presumption of innocence' charge with particular reference to the failure of the accused to testify." Fogler v. State, 96 Fla. 68, 71, 117 So. 694, 695 (1928). The United States Supreme Court has specifically rejected the argument that any comment on a defendant's decision not to testify is reversible error. Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). "To be constitutionally proscribed, a comment must be adverse." State v. Mata, 125 Ariz. 233, 238, 609 P.2d 48, 53, cert. denied, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980). An adverse comment is one which allows the jury to draw adverse inferences from a defendant's decision not to testify and thereby puts pressure on him to personally respond to the charges. See Lakeside v. Oregon; State v. Mata. Since the comment in this case was not adverse and did not put pressure on the appellant to testify, the instruction did not violate appellant's right not to be a witness against himself.
Regarding the sufficiency of the evidence, my review of the record convinces me that there was no proof beyond a reasonable doubt of penetration or union within the meaning of section 794.011(1)(f), Florida Statutes (1979). There was, however, ample evidence of an attempt to commit the crime of sexual battery upon a child of eleven or younger. I would therefore vacate the conviction and sentence and remand with instructions to enter judgment for attempted sexual battery and to impose an appropriate sentence.
SHAW, Judge, concurring in part and dissenting in part.
After being indicted, the appellant, who is black, filed a motion to dismiss the indictment because black citizens of Leon County had been systematically excluded from serving as grand jury foremen. Counsel for the appellant and the state agreed that the following stipulation from a pending case could be used in the present case:
1. Since 1955 there has not been a black grand jury foreman in Leon County.
2. It is unknown whether there were any black grand jury foremen in Leon County prior to 1955.
3. According to the United States Census Bureau, the population of Leon County in 1950 was 59,590, blacks represented 39.5% of that population.
4. According to the United States Census Bureau, the population of Leon County in 1960 was 74,225, blacks represented 32.9% of the population.
5. According to the United States Census Bureau, the population of Leon County in 1970 was 103,047, blacks represented 25.3% of the population.
6. There is no census figure yet available for 1980, but the Leon County Planning Department estimates that the 1980 population of Leon County is 147,500. The Department estimates that 19.7% of the 1980 population is black.
The Leon County Deputy Clerk testified that fifty grand jury foremen had been selected in Leon County since 1955. Five witnesses testified on behalf of the state. One witness was an assistant state attorney who testified concerning general grand *88 jury procedures, but provided no insight as to the criteria used for the selection of the grand jury foreman. Two circuit court judges testified concerning grand jury selection in counties other than Leon. Neither had ever impaneled a grand jury in Leon County. Testimony was adduced from the two remaining circuit court judges, both of whom had impaneled grand juries in Leon County. One judge testified that in making a grand jury foreman selection he looked for
[a] person who in my opinion has had the county's interest at heart and will continue to have the county's interest at heart and particularly for leadership qualities to head up a group of people for six months, 18 people for six months. I want one with leadership qualities to avoid having a run-away grand jury that will go off on a tangent and won't be responsible.
The second judge testified that
[p]ersonally, after I have drawn the grand jury, then I usually confer with the sheriff and the clerk and anyone else I feel that would be helpful and draw on my own knowledge of the people, if I do know, to try to select persons who are generally sufficiently either educated or experienced to preside over the grand jury and to act as a presiding officer. I just try to take into consideration the qualifications of the individual... . Well, I want someone that I feel would be sufficiently knowledgeable about procedures to chair a meeting, either from experience as a business person or one who is educated. I just feel that someone who was completely uneducated, who had never been to school or never had had any particular . . who had no experience, would be very uncomfortable and could not serve adequately in that capacity.
The only credible evidence concerning the criteria and method used in the Leon County selection process is found in the testimony of these two latter witnesses. The issue at that point was whether Andrews presented a prima facie case of unconstitutional underrepresentation and, if so, whether the testimony of the two relevant witnesses was sufficient to rebut that case.
The circuit court made the following findings of fact and conclusions of law:
1. The defendants are black and blacks as a group are a recognizable distinct class often singled out for different treatment under the laws, as written or applied.
2. The Judge who selects a grand jury foreman is generally aware of which jurors are black and the process is therefore susceptible to abuse.
3. The evidence establishes a degree of under representation of blacks in the position of Leon County Grand Jury Foreman as compared to the general population of Leon County for a significant period which would be unlikely to occur by chance.
4. These black defendants have a constitutional right to a grand jury the foreman of which was not selected by a process which deliberately and systematically excluded blacks.
5. There is no evidence of nor challenge to the racial composition of the grand juries empaneled in Leon County during the critical period.
6. If the selection of the grand juries was racially neutral as we must assume it was, it could result in a racial composition disproportionate to the population without being constitutionally objectionable.
7. Statistical calculations based on a comparison of the number of black grand jury foremen selected to the number of blacks in the general population are not competent to establish a systematic and deliberate exclusion of blacks from that position without a showing as to the number of blacks from which the selection was made; i.e., the grand jury panel.
8. The defendants did not in this Court's opinion establish a prima facie case of discrimination under the "rule of exclusion."

*89 9. The Supreme Court of the United States has held that a prima facie case of discrimination could be established by a statistical comparison of the number of persons with Spanish Surnames called for jury duty to the number of "persons of Spanish Language or Spanish Surnames" in the general population, Castaneda v. Partida [430 U.S. 482], 97 S.Ct. 1272 [51 L.Ed.2d 498 (1977)], and this Court should therefore, for the sake of judicial efficiency, determine whether or not a prima facie case would have been rebutted had it been established.
10. Every circuit judge involved with the selection of grand jury foremen in Leon County during the critical period, who testified, gave the specific criteria he used in selecting a grand jury foreman. Each denied that race was one of those criteria. Leadership and ability to preside over the deliberations seemed to be the most common and persuasive criteria used.
11. The evidence presented by the State was sufficient to rebut a prima facie case that blacks had been deliberately and systematically excluded from the position of grand jury foreman had such a case been established.
In Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the United States Supreme Court spelled out the test for determining whether a prima facie case has been presented regarding a claim of racial discrimination in selection of grand jury foremen:
The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied... . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time... . This method of proof, sometimes called the "rule of exclusion", has been held to be available as a method of proving discrimination in jury selection against a delineated class... . Finally ... a selection procedure that is susceptible to abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.
Id. at 565, 99 S.Ct. at 3005, quoting Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).
Once a prima facie case of discrimination is established using this approach, the burden shifts to the state to rebut that prima facie case. The circuit judge in this instance found as fact: (1) that the defendants are black and blacks as a group are a recognizably, distinct class often signled out for different treatment under the laws, as written or applied, (2) that the judge who selects a grand jury foreman is generally aware of which jurors are black and the process is therefore susceptible to abuse, and (3) that the evidence establishes a degree of underrepresentation of blacks in the position of Leon County grand jury foreman as compared to the general population of Leon County for a significant period which would be unlikely to occur by chance. These crucial findings clearly established a prima facie case, thereby shifting to the state the burden to rebut the presumption of discrimination. It then became the state's burden to show that racially neutral selection procedures produced the disparity. Simple affirmations of good faith in making the individual foreman selections are insufficient to rebut such a case. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970).
The majority opinion points out that testimony similar to that adduced in the instant case was deemed sufficient for rebuttal purposes in United States v. Holman, 510 F. Supp. 1175 (N.D.Fla. 1981), and United States v. Perez-Hernandez, 672 F.2d 1380 (11th Cir.1982). This analogy fails to recognize that in Perez-Hernandez eight federal district judges testified (and established by way of their testimony) that in selecting the grand jury foremen during the years in question they considered (1) *90 occupation and work history, (2) leadership and management experience, (3) length of time in the community, and (4) attentiveness during the jury impanelment. The majority opinion also fails to recognize the distinction between those cases and the present one in that Perez-Hernandez deals with a four-year time span, and in Holman the court was dealing with a ten-year time span. Even so, in Holman, Circuit Judge Hatchett, sitting by designation to hear the appellant's motion to dismiss, cautioned that "[a]lthough the court approves the criteria now being used, this criteria over a relevant period of time must result in a fair cross-section of the community in the office of grand jury foreperson, or be subject to attack on constitutional grounds." 510 F. Supp. at 1180 n. 3.
Here we are dealing with a period of twenty-five years, from 1955 through 1980, and fifty grand juries in which there has never been a black grand jury foreman selected in Leon County. Obviously the state's burden should be heavier when attempting to rebut a twenty-five year period of prima facie discrimination as opposed to a four-year or even a ten-year period. The evidence adduced by the state was neither of the quality nor quantity as that adduced in Perez-Hernandez or Holman. The relevant testimony came from the judges who had impaneled grand juries in Leon County. The three criteria enunciated by these judges were (1) leadership qualities, (2) the county's interest at heart, and (3) sufficient education or experience to preside over a grand jury and to act as a presiding officer. I question whether community interest is an acceptable criteria. It is an extremely subjective test that of necessity reflects the qualifying judge's background, experience, beliefs, and possible prejudice and has no measurable norm. See Turner, 396 U.S. at 361, 90 S.Ct. at 540, where jury commissioners disqualified blacks because they were not "upright."
Conceding for the sake of argument that leadership ability, community interest, and sufficient education to preside over a grand jury are desirable qualities to have in a grand jury foreman, the next logical question is how has Leon County gone about the process of ascertaining which members of the grand jury panels possess these qualities. For our answer we must rely upon the testimony of the two judges who have impaneled grand juries in Leon County. One judge testified that he used his own knowledge of the grand jurors. The second judge testified that after the grand jury was sworn he usually conferred with the sheriff, the clerk, and anyone else he felt would be helpful and drew upon his own knowledge as to the people. There is nothing in the record to indicate that the jurors were questioned regarding their work history, leadership abilities, management experience, education, length of time in the community, experience in presiding over meetings, or that there was any similar inquiry calculated to ascertain the qualifications of individual jury members. It is unlikely that the judge, the sheriff, the clerk, or others who happened to be available at the time could evaluate the qualifications of the jurors without such inquiry. In 1980, there were over 75,000 registered voters in Leon County from whom the grand jurors were randomly selected. The fact that the judge might recognize juror number three as an outstanding community leader does not negate the fact that juror number five, unbeknownst to the judge absent inquiry, might be equally outstanding in his community and equally qualified. Where the selection procedure is susceptible to abuse, as it is here, and a prima facie case of unconstitutional discrimination is established, it is incumbent on the state to show that the selection procedure is racially neutral. Leon County contains the state capital with two universities, a multitude of black state employees, a sizeable black academic community, and an electorate where blacks comprise approximately 20% of the registered voters from which the grand jurors are randomly selected.[1] Thus, it can *91 be presumed that some 20% of the grand jurors would be drawn from a black community likely to produce qualified grand jury foremen. Inexplicably, this process has not produced a black foreman within the recorded history of Leon County. Testimony of the judges that they themselves are racially neutral is insufficient to rebut the overwhelming prima facie case of systematic exclusion. This is not to suggest that the judges are racially biased. It is the selection process that is under scrutiny, not the personal attitudes of the judges.
The majority opinion goes on to point out that even if Andrews has established a prima facie case of discrimination he is still not entitled to relief because the grand jury foreman in Florida, like the grand jury foreman in the federal court system, plays an insignificant role in the proper administration of justice. I perceive this to mean that in Florida, even if unrebutted discrimination is shown in the selection of the grand jury foreman, no relief is available. To support this position the opinion draws upon the concurring opinion of Judge Morgan in Perez-Hernandez. I would only point out that the majority opinion in Perez-Hernandez considered and rejected Judge Morgan's argument by holding that the position of grand jury foreman in the federal court system is a constitutionally significant position. The trial court properly found, and case law supports its finding, that black defendants have a constitutional right to a grand jury foreman selection process which does not deliberately and systematically exclude blacks. This Court's opinion appears to say that in Florida there is no such constitutional right.
Finally, the majority questions whether Rose v. Mitchell is even applicable to the Florida grand jury foreman selection process in light of the fact that the Florida grand jury foreman is chosen from a randomly selected grand jury rather than from the entire population and then added as an additional member of the panel. The court would require a statistical calculation based on a comparison of the proportion of blacks in the grand jury panels to the proportion called to serve as foreman and would place the burden on the defendant to produce the necessary figures before a prima facie case could be established. I disagree. Rose, Holman, and Perez-Hernandez all rely on the proportion of the group in the total population to the proportion called to serve as foremen over a significant period of time. Once the defendant establishes a prima facie case based on the controlling criteria in Rose, the burden shifts to the state to rebut the case. If the state wishes to rely on the proposition that the composition of the jury venire is significantly different from that of the general population, it should have the burden of producing the relevant figures and demonstrating that these figures rebut the prima facie case of unconstitutional exclusion. In Florida, qualifications of jurors are governed by section 40.01, Florida Statutes (1981). The only qualification is that the jurors be registered electors of the county. If the grand jury venires are racially neutral, as the trial court found, then it is logical to assume that grand juries, over a significant period of time, will approximately parallel the composition of the county electorate.[2] Barring the introduction of evidence by the state showing that this assumption is incorrect, it is misleading to argue that the defendant must somehow accurately ascertain the racial composition of grand jury panels over an extended period of time despite testimony that such figures do not exist. The Court's approach places upon the appellant a greater degree of proof than the circumstances permit or *92 controlling case law requires. A state wishing to perpetuate a discriminatory practice could simply fail to keep such figures and thereby successfully defeat any challenge. Bearing in mind that the sole importance of figures in this type of case lies in their use as a tool to show significant underrepresentation, I see nothing wrong with using census figures when other figures are unavailable through no fault of the party alleging systematic exclusion.
The majority approach ignores the stark reality that between 1955 and 1980, a period of twenty-five years encompassing fifty grand juries, there never was a black grand jury foreman even though the statistical likelihood of such a result occurring by chance is astronomical.[3] If the selection process that produced this phenomenon is permitted to continue, there is nothing to suggest that another twenty-five years will not elapse without a black being selected to serve as a grand jury foreman. Perhaps there is a constitutionally acceptable explanation for the phenomenon. The state in this instance has failed to supply that explanation by showing that racially neutral selection procedure produced the disparity. I would therefore reverse on the ground that the state failed to rebut a prima facie case of unconstitutional discrimination. I respectfully dissent from that portion of the majority opinion that approves the Leon County grand jury foreman selection process and concur in the remainder of the opinion.
ADKINS and EHRLICH, JJ., concur.
NOTES
[1] See Carter v. Kentucky, 450 U.S. at 303 n. 21, 101 S.Ct. at 1120 n. 21:

The importance of a no-inference instruction is underscored by a recent national public opinion survey conducted for the National Center For State Courts, revealing that 37% of those interviewed believed that it is the responsibility of the accused to prove his innocence. 64 ABAJ 653 (1978).
[1] See official reports on registered voters from the Florida Department of State for the years 1956-1980.
[2] I have no wish to introduce evidence during appellate review, but official reports from the Florida Secretary of State on the proportion of registered black voters for the years in question are readily available. In October 1980, 72,291 registered voters were identified as to race (Democrat and Republican parties); 14,390 (19%) of those registered voters were black; an additional 4,238 registered voters (other parties) were not identified as to race. If all of the 4,238 other party registered voters are assumed to be white, an unlikely assumption, the percentage of black voters is reduced only to 18%. See Department of State, Tabulation of Official Votes, Florida General Election 1 (November 4, 1980).
[3] The record shows that blacks comprised 39.5% of the Leon County population in 1950, 32.9% in 1960, 25.3% in 1970, and an estimated 19.7% in 1980. Figures now available show that blacks actually comprised 24.6% of the Leon County population in 1980. 1980 Census of Population, Volume I, Chapter B, Part II, page 11-16, Department of Commerce, Bureau of the Census, issued August, 1982. Appellant without challenge points out that if we assume that the average percentage of blacks in the population during the period was 25%, then, statistically, the likelihood of no black foreman being selected is approximately one in 1.6 million.