

# Office of the Attorney General
## State of Texas
November 6, 1998

**DAN MORALES**
ATTORNEY GENERAL

The Honorable Sherry L. Robinson
Criminal District Attorney
Waller County
836 Austin Street, Suite 105
Hempstead, Texas 77445

Opinion No. DM-484

Re:    Whether Water Code section 53.063(2), requiring a fresh-water-supply district supervisor to own land in the district, and a parallel provision in the Brookshire-Katy Drainage District's enabling act violate the Equal Protection Clause of the United States Constitution, and related question    (RQ-983)

Dear Ms. Robinson:

Water Code section 53.063, which sets out qualifications for election to a fresh-water-supply district board of supervisors, precludes an individual who does not own land in the district from serving as a supervisor. Likewise, the Brookshire-Katy Drainage District's enabling act forbids an individual who does not own land in the district to sit on the district's governing board. We understand you to ask about the constitutionality of the land-ownership requirements in Water Code section 53.063 and in the Brookshire-Katy Drainage District's enabling act. We conclude that a court would evaluate the land-ownership requirements using the rational-basis standard. We are unable to ultimately dispose of the issue you raise, however, because we are uncertain as to the state purpose the land-ownership requirements are intended to further. Consequently, we cannot evaluate the legitimacy of the state purpose. In addition, whether the Brookshire-Katy Drainage District (the "drainage district") has a special limited purpose and whether its activities disproportionately affect landowners—which questions must be answered to determine whether the land-ownership requirements rationally further a legitimate state purpose—require the resolution of fact questions, which cannot be answered in the opinion process.

You also question whether the legislature has repealed Water Code section 53.063. We conclude that it has not.

We begin our discussion by examining the drainage district's enabling legislation and other statutes applicable to the drainage district, including Water Code section 53.063. The legislature created the drainage district in 1961 under Texas Constitution article XVI, section 59.[1] The district's enabling act establishes the district's "sole purpose": to reclaim and drain, as necessary, lands within

---

[1]*See* Act of May 4, 1961, 57th Leg., R.S., ch. 203, 1961 Tex. Gen. Laws 402, 402-05.

the district.[2] The legislature explicitly found that the achievement of this purpose would benefit "all of the lands and other property included within the District" and that all lands and property likewise would benefit from "the improvements that the District will purchase, construct, or otherwise acquire."[3] To accomplish these public benefits,[4] the enabling act endows the district generally with all of the powers and duties of a fresh-water-supply district created under article XVI, section 59 of the Texas Constitution.[5] Moreover, the enabling act specifically authorizes the drainage district to levy and collect taxes in accordance with general laws pertaining to fresh-water-supply districts.[6]

The Brookshire-Katy Drainage District's enabling act creates a board of five elected supervisors to manage and control the drainage district[7] and establishes three eligibility requirements:

1. A candidate for supervisor must be more than twenty-one years of age.

2. A candidate for supervisor must own land subject to taxation in the drainage district.

3. A candidate for supervisor must reside in the area of the drainage district from which he or she seeks election.[8]

In addition to its enabling act, the drainage district is subject, among other things, to Water Code chapters 49 and 53. Chapter 49, containing provisions generally applicable to all general-law districts,[9] authorizes the drainage district, among other things, to adopt "all necessary charges, fees,

---

[2]*See id.* § 2, 1961 Tex. Gen. Laws 402, 403.

[3]*Id.* §§ 6, 7, 1961 Tex. Gen. Laws 402, 405.

[4]*See id.* § 6, 1961 Tex. Gen. Laws 402, 405.

[5]*Id.* §§ 2, 3, 1961 Tex. Gen. Laws 402, 403, 404.

[6]*See id.* § 5, 1961 Tex. Gen. Laws 402, 405, *as amended by* Act of May 4, 1967, 60th Leg., R.S., ch. 220, § 1, 1967 Tex. Gen. Laws 513, 514.

[7]*See id.* § 3, 1961 Tex. Gen. Laws 402, 404.

[8]*See id.*

[9]Water Code chapter 49 applies to any district created under Texas Constitution article XVI, section 59, except for certain navigation districts, port authorities, or conservation and reclamation districts. Water Code § 49.001(a)(1). The drainage district is not excepted from chapter 49.

or rentals, in addition to taxes, for providing or making available any district facility or service."[10] Chapter 53 pertains more particularly to fresh-water-supply districts.[11] Under chapter 53, a fresh-water-supply district may "conserve, transport, and distribute fresh water from any sources for domestic and commercial purposes."[12] Included within this broad authority are specific powers to prescribe the terms on which a district will furnish water; to fix the rate users will pay to purchase water from the district; and to regulate the distribution and use of water.[13] Chapter 53 further authorizes a fresh-water-supply district to acquire and repair sanitary sewer systems using revenues from the sale of bonds or other obligations, maintenance taxes, or operating revenues.[14] Moreover, chapter 53 permits a district to issue bonds to secure indebtedness[15] and, once it has done so, to "levy taxes on all property in the district, whether real, personal, or mixed."[16]

Like the drainage district's enabling act, Water Code section 53.063 establishes qualifications for supervisors of a fresh-water-supply district:

1.      He or she must be twenty-one years of age or older at the time of the election.

2.      He or she must own land within the district.

3.      He or she must reside in the district.

Certainly, to the extent the drainage district's enabling act sets eligibility standards that are inconsistent with those in section 53.063, the enabling act's standards prevail.[17] We need not resolve any inconsistencies here, though, because both section 3 of the enabling act and Water Code section

---

[10]*Id.* § 49.212.

[11]*See id.* § 53.001(1).

[12]*Id.* § 53.101.

[13]*See id.* § 53.107(a).

[14]*See id.* § 53.151(a); *see also id.* § 49.107(a) (requiring maintenance-tax election).

[15]*See id.* § 53.171(a).

[16]*Id.* § 53.188.

[17]*See* Act of May 4, 1961, 57th Leg., R.S., ch. 203, § 2, 1961 Tex. Gen. Laws 402, 403.

53.063(2) require a candidate for election as a supervisor to own land within the district.[18] The land-ownership requirement is the only requirement you question.

As a preliminary matter, you question whether section 53.063 has been repealed; a repeal, you suggest, would moot your primary question: whether the land-ownership requirement violates federal equal protection mandates. We are uncertain as to how this would moot your primary question because the land-ownership requirement is also in the drainage district's enabling act. Nevertheless, we will respond.

We conclude that Water Code section 53.063 has not been repealed. The drainage district's superintendent avers that the statute book's pocket part lists section 53.0631, not section 53.063, as repealed. Nevertheless, the superintendent has been unable to find any record of section 53.0631, and he therefore inquires whether the pocket part's listing of section 53.0631 is a typographical error. Certainly, where the publisher has made an error in printing a statute, we should disregard it.[19] But the pocket part is not in error. We have found no legislation repealing Water Code section 53.063. Moreover, we have found that the legislature enacted section 53.0631 in 1973,[20] amended it in 1975,[21] and repealed it in 1989.[22] Section 53.0631 set out several grounds for disqualifying a supervisor;[23] its substance now is found in Water Code section 50.026.[24]

We proceed to consider your primary question. You suggest that the land-ownership requirement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by distinguishing among individuals who are otherwise eligible for election to the board of supervisors solely on the basis of whether the individuals own land in the district.[25] The Equal Protection Clause prohibits a state from denying "to any person within its jurisdiction the equal

---

[18]We note that the drainage district's enabling act limits ballot access to an individual who owns land "subject to taxation" in the district, while Water Code section 53.063(2) limits ballot access to any individual owning land in the district, regardless of the land's taxability. We do not need to resolve any inconsistency created by this difference in language to answer the questions you have posed.

[19]See 67 TEX. JUR. 3D Statutes § 117, at 700 (1989).

[20]See Act of May 24, 1973, 63d Leg., R.S., ch. 635, sec. 3, § 53.0631, 1973 Tex. Gen. Laws 1748, 1750-51.

[21]See Act of May 14, 1975, 64th Leg., R.S., ch. 248, § 3, 1975 Tex. Gen. Laws 600, 602-03.

[22]See Act of May 28, 1989, 71st Leg., R.S., ch. 328, § 12, 1989 Tex. Gen. Laws 1292, 1295.

[23]See Act of May 24, 1973, 63d Leg., R.S., ch. 635, sec. 3, § 53.0631, 1973 Tex. Gen. Laws 1748, 1750-51.

[24]See Act of May 28, 1989, 71st Leg., R.S., ch. 328, § 1, 1989 Tex. Gen. Laws 1291, 1292-93.

[25]See Zobel v. Williams, 457 U.S. 55, 60 (1982).

protection of the laws,"[26] but it does not absolutely forbid all legislative classifications.[27] Rather, a legislative classification must either rationally serve a legitimate state purpose[28] or, if the classification infringes a fundamental right or creates an inherently suspect classification, serve a compelling state interest.[29]

A court would scrutinize the land-ownership requirement you question using the rationality standard. Because candidacy is not a fundamental right,[30] this restriction on ballot access is not entitled to heightened scrutiny. In addition, neither landowners nor non-landowners ever have been held to be a suspect class of individuals.

We are unable to predict, however, whether a court would determine that the land-ownership requirement serves a legitimate state interest. In the first place, we are uncertain as to the state interest served by the land-ownership requirement. "'In determining whether or not state law violates the Equal Protection Clause, a court must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interest of those who are disadvantaged by the classification.'"[31] We looked in the statute's history for evidence of the interests the legislature designed the statute to protect. We found that the legislature originally enacted the substance of section 53.063 in 1919.[32] At that time, of course, some restrictions on ballot access may have been designed to exclude, on racial grounds, some people from governmental positions.[33] On the other hand, the legislature might have imposed the land-ownership requirement because it believed that landowners comprised the class that would be primarily affected by the activities of a fresh-water-supply district. In any event, the age of the enactment precludes us from ascertaining the legislature's purpose, and no purpose has been proposed to us. Moreover, whether the land-ownership requirement rationally relates to the ostensible purpose is a question requiring fact determinations, which we are not equipped to resolve in the opinion process.[34] In the second

---

[26]U.S. CONST. amend. XIV, § 1.

[27]*See* Attorney General Opinion JM-289 (1984) at 2.

[28]*See id.* at 2-3.

[29]*See id.* at 2.

[30]*See Clements v. Fashing*, 457 U.S. 957, 963 (1982) (Rehnquist, J.) (plurality opinion) (citing *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

[31]*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 725 (1973) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

[32]*See* Act of July 19, 1919, 36th Leg., 2d C.S., ch. 48, § 15, 1919 Tex. Gen. Laws 107, 111.

[33]*Cf. Turner v. Fouche*, 396 U.S. 346 (1970).

[34]*See, e.g.*, Attorney General Opinions DM-98 (1992) at 3; H-56 (1973) at 3; M-187 (1968) at 3; O-2911 (1940)
(continued...)

place, a court probably could not determine the constitutionality of the classification without determining whether the drainage district's purpose is so limited, and the drainage district's activities so disproportionately affect landowners, as to justify the restriction on ballot access. This determination, too, requires fact-based analyses for its resolution, and it is not, therefore, amenable to the opinion process.[35]

The United States Supreme Court has upheld restrictions on the franchise where the governing body to be elected oversees a district with a specialized, narrow purpose, the activities of which the Court found to disproportionately affect landowners. In *Salyer Land Company v. Tulare Lake Basin Water Storage District,*[36] for example, the Court concluded that a statute permitting only landowners to vote in water storage district general elections reasonably furthered a legitimate state purpose and did not, therefore, violate the Equal Protection Clause.[37] Although the Court conceded that non-landowners had an interest in the water storage district's activities, the Court did not deem that interest sufficient to overcome the presumption that the statute is reasonable.[38] More importantly, the Court determined that, because of the water storage district's "special limited purpose" and the fact that the district's activities disproportionately affect landowners as a group, non-landowners were not entitled to a vote in the election of the district's governing board.[39] First, according to the Court, the water storage district exists primarily to acquire, store, and distribute water for farming in the Tulare Lake Basin.[40] The district's "incidental" powers, such as acquiring and operating necessary works for the storage and distribution of water; generating and distributing hydroelectric power; and fixing charges for the use of the water,[41] did not, apparently, expand the district's purpose beyond what the Court called the district's "special limited purpose." Second, the Court found that the statutory scheme precludes economically burdening a non-landowner *qua* district resident; rather, "[a]ll of the costs of district projects are assessed against land . . . in proportion to the benefits received."[42]

---

[34](...continued)
at 2.

[35]*See, e.g.,* Attorney General Opinions DM-98 (1992) at 3; H-56 (1973) at 3; M-187 (1968) at 3; O-2911 (1940) at 2.

[36]410 U.S. 719 (1973).

[37]*See id.* at 734-35.

[38]*See id.* at 732.

[39]*See id.* at 728.

[40]*See id.*

[41]*See id.* at 723-24.

[42]*Id.* at 729.

Likewise, in *Ball v. James*[43] the Court upheld an Arizona statute that limited the franchise in elections for directors of an agricultural improvement and power district to landowners.[44] The Court concluded that the land-ownership requirement reasonably relates to its statutory objectives.[45] As in *Salyer*, the *Ball* decision hinges on the Court's determination that the public entity at issue, the Salt River Project Agricultural Improvement and Power District, has a "peculiarly narrow function": to store, deliver, and conserve water.[46] Significantly, water is distributed according to land ownership.[47] The district's sale of electricity to subsidize its water operations is, the parties stipulated, incidental to this primary function.[48] In addition, although the district may condemn land, sell tax-exempt bonds, and levy taxes on real property,[49] the district's actions, the Court said, disproportionately affect landowners.[50] The district could not, for example, levy an ad valorem tax or a sales tax to which all, landowners and non-landowners alike, would be subject;[51] rather, "the voting landowners are the only residents of the District whose lands are subject to liens to secure District bonds. Only these landowners are subject to the acreage-based taxing power of the District, and voting landowners are the only residents who have ever committed capital to the District through stock assessments charged by the [District]."[52]

On the other hand, the United States Supreme Court has struck down as unconstitutional statutes that deem non-landowners ineligible to serve in certain offices. In *Turner v. Fouche*[53] the Court held invalid a Georgia law requiring that members of a county board of education be

---

[43]451 U.S. 355 (1981).

[44]*See id.* at 371 (plurality opinion); *see also id.* at 372 (Powell, J., concurring); *accord Associated Enters., Inc. v. Toltec Watershed Imp. Dist.*, 410 U.S. 743, 744 (1973) (per curiam) (upholding Wyoming statute that authorizes only landowners to vote to create water district; finding Wyoming watershed district "is a governmental unit of special or limited purpose whose activities have a disproportionate effect on landowners within the district.").

[45]*See Ball v. James*, 451 U.S. at 371.

[46]*See id.* at 357.

[47]*See id.* at 367.

[48]*See id.* at 368-69.

[49]*See id.* at 360.

[50]*See id.* at 370.

[51]*See id.* at 366.

[52]*Id.* at 370.

[53]396 U.S. 346 (1970).

freeholders.[54]  The Court said, "The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees."[55]  While the Court often defers to lawmakers in determining whether a particular statute meets the rationality standard, it determined in *Turner* that "the Georgia free-holder requirement must fall even when measured by the traditional test for a denial of equal protection . . . ."[56]  The Court thus deemed insufficient Georgia's argument in support of the freeholder requirement: that because the statute did not specify a minimum real-property holding, anyone who "aspires to county school-board membership 'would be able to obtain a conveyance of the single square inch of land he would require to become a 'freeholder.'"[57]  In short, the Court concluded that Georgia could not rationally presume that a citizen who did not own land would be an irresponsible member of a county board of education.[58]  Additionally, the Court would not permit the state to presume that a non-landowner lacks attachment to the community and its educational values.[59]

Likewise, in *Quinn v. Millsap*[60] the Court struck as violative of equal protection a Missouri law requiring an appointee to a particular office to own real property.[61]  The Missouri Constitution permitted the governments of the City of St. Louis and St. Louis County to reorganize if the city and county electorate approved a reorganization plan drafted by a "board of freeholders."[62]  The State of Missouri offered three rationales for the real-property requirement.[63]  First, the State claimed that a real-property owner knows "'first[]hand . . . the value of good schools, sewer systems[,] and the other problems and amenities of urban life.'"[64]  Second, the State asserted that a real-property owner

---

[54]*See id.* at 364.

[55]*Id.* at 362-63.

[56]*Id.* at 362. In *Turner* the Court considered whether a Georgia scheme for appointing members to a county board of education unconstitutionally discriminated against individuals on the basis of their race. *See id.* at 350. Race-based classifications generally are subject to stricter scrutiny than the rational-basis standard. *See id.* at 362. The *Turner* Court did not apply a heightened standard, nevertheless, because the scheme at issue did not even satisfy the lesser standard. *See id.*

[57]*Id.* at 363.

[58]*Id.* at 363-64.

[59]*See id.* at 364.

[60]491 U.S. 95 (1989).

[61]*See id.* at 108.

[62]*See id.* at 96.

[63]*See id.* at 107.

[64]*See id.* (quoting Brief for Appellees 41).

"'has a tangible stake in the long[-]term future'" of the area in which the owner lives.[65] Third, the State argued that the land-ownership requirement was justified because the board of freeholders considers issues that may relate to land.[66] The *Quinn* Court concluded, however, that its decision in *Turner* disposed of the first two of the proffered justifications:[67]

> As to the first, the [*Turner*] Court explained that an ability to understand the issues concerning one's community does not depend on ownership of real property. . . . The Court in Turner also squarely rejected appellees' second argument by recognizing that persons can be attached to their community without owning real property.[68]

Similarly, the *Quinn* Court concluded that *Turner* and its progeny disposed of the third proffered justification: "[T]he mere fact that the board of freeholders considers land-use issues cannot suffice to sustain a land-ownership requirement in this case."[69] Furthermore, according to the Court, the effect of the board's work would not be limited to landowners, but would extend to all citizens of the city and county.[70] Consequently, the Court stated, the State of Missouri could not "entirely exclude from eligibility for appointment to this board" all individuals who do not own real property.[71]

We believe a court evaluating the land-ownership requirements in Water Code section 53.063(2) and the drainage district's enabling act would have to consider whether the purpose of the drainage district is "sufficiently specialized and narrow and whether its activities bear on landowners so disproportionately as to distinguish" the drainage district from those public entities whose more general governmental functions warrant application of the *Turner/Quinn* analysis.[72] If a court determines that the drainage district does not serve a sufficiently narrow purpose and that the drainage district's activities affect landowners and non-landowners proportionately, we believe it

---

[65]*See id.* (quoting Brief for Appellees 41).

[66]*See id.* at 108.

[67]*See id.*

[68]*Id.* at 108 (quoting *Turner*, 396 U.S. at 363-64).

[69]*See id.* at 108-09.

[70]*See id.* at 109.

[71]*See id.*

[72]*See Ball*, 451 U.S. at 362. We found no cases applying the analysis enunciated in *Salyer* and *Ball*, voting rights cases, to a ballot-access situation like this. But we believe that a court evaluating the land-ownership requirement in Water Code section 53.063(2) and the district's enabling act would have to consider their applicability. In *Quinn*, a ballot-access case, the Court hinted that the *Salyer/Ball* analysis might apply in an appropriate ballot-access case. *See Quinn*, 491 U.S. at 105.

would be likely to follow *Turner* and *Quinn* and conclude that the land-ownership requirements violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because they do not rationally serve a legitimate state purpose. If, on the other hand, a court determines that the drainage district's purpose is sufficiently narrow and the district's activities disproportionately affect landowners, we believe the court would conclude, consistently with the *Salyer Land Co./Ball* cases, that the land-ownership requirements pass constitutional muster. We note, in this regard, that the United States Court of Appeals for the Fifth Circuit has indicated that the land-ownership requirement in Water Code section 53.063's sister statute pertaining to water control and improvement districts, Water Code section 51.072, may raise an equal-protection issue: "We are unable to say . . . that [an] assertion of the unconstitutionality of section 51.072 of the . . . Water Code requiring that a candidate for water district director be a freeholder, is insubstantial . . . ."[73] Unfortunately for us, the Fifth Circuit did not resolve the question, and we have not found any other judicial decision considering the issue.

---

[73]*Fonseca v. Hidalgo County Water Imp. Dist. No. 2*, 496 F.2d 109, 112 (5th Cir. 1974).

## S U M M A R Y

Water Code section 53.063 has not been repealed.

If the requirements in Water Code section 53.063(2) and the enabling act for the Brookshire-Katy Drainage District prohibiting a non-landowner from holding a position on the drainage district's governing board rationally serve a legitimate state purpose, a court would likely conclude that the requirements do not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Kymberly K. Oltrogge
Assistant Attorney General